

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
08/28/2020

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ROSEHILL RESOURCES INC., *et al.*, | § | Case No. 20-33695 (DRJ) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | **Re: Docket No. 13, 70** |

**FINAL ORDER UNDER SECTIONS 105(a), 361, 362, 363, 364, 503, AND 507 OF THE
BANKRUPTCY CODE, BANKRUPTCY RULES 4001, 6003, 6004 AND 9014, AND THE
COMPLEX CASE RULES, (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN
POSTPETITION FINANCING AND (B) UTILIZE
CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-referenced debtors, as debtors in possession

(collectively, the "Debtors") in the above-captioned cases (the "Cases"), pursuant to sections 105,

361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§101- 1532 (the

"Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy

Procedure  (the "Bankruptcy Rules"), and Rules 1075-1, 4002-1, and 9013-1 of the Local Rules

of Bankruptcy Practice and Procedure for the Southern District of Texas (the "Bankruptcy Local

Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the

"Complex Case Rules"), seeking, among other things:

> (a)     authorization for the Debtors, pursuant to sections 105, 361, 362, 363, 364,
> 503 and 507 of the Bankruptcy Code, to (i) use cash collateral, as such term is
> defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), and all other
> Prepetition Collateral (as defined herein), solely in accordance with the terms of
> the interim order entered by the Court on July 27, 2020 (Docket No. 70)

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are: Rosehill Resources Inc.
(4262), and Rosehill Operating Company, LLC (1818).  The Debtors' corporate headquarters and the mailing address
for each Debtor is 16200 Park Row, Suite 300, Houston, Texas 77084.
[2] Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Motion.

(the "<u>Interim Order</u>") and this final order (this "<u>Final Order</u>"), (ii) use the proceeds of the DIP Facility (as defined herein), solely in accordance with the terms of this Final Order, and (iii) provide adequate protection to JPMorgan Chase Bank, N.A., as Administrative Agent and as an Issuing Bank (in such capacity, the "<u>First Lien Administrative Agent</u>") under the First Lien Credit Agreement (as defined herein), the other Prepetition First Lien Secured Parties (as defined herein), U.S. Bank National Association, as agent (in such capacity, the "<u>Second Lien Administrative Agent</u>" and, together with the First Lien Administrative Agent, the "<u>Prepetition Administrative Agents</u>") under the Second Lien NPA (as defined herein), and the other Prepetition Second Lien Secured Parties (as defined herein).

(b)      authorizing Rosehill Operating Company, LLC (the "<u>DIP Borrower</u>" or "<u>ROC</u>") to obtain postpetition financing on a junior secured basis, consisting of a new money convertible delayed-draw term loan facility (the "<u>DIP Facility</u>," and the loans issued thereunder, the "<u>DIP Loans</u>") in an aggregate principal amount of $17,500,000, of which (x) $8,750,000 was made available to the DIP Borrower on an interim basis, and (y) the full amount of which shall be made available to the DIP Borrower within three (3) Business Days (as defined in the DIP Credit Agreement "<u>Business Day</u>" or "<u>Business Days</u>") after the entry of this Final Order, pursuant to the terms and conditions set forth in this Final Order and that certain credit agreement (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Credit Agreement</u>"), executed by the DIP Borrower, U.S. Bank National Association, as the administrative agent and collateral agent for the DIP Facility (the "<u>DIP Administrative Agent</u>" and together with the First Lien Administrative Agent and the Second Lien Administrative Agent, the "<u>Administrative Agents</u>"), and each of the Lenders (as defined in the DIP Credit Agreement, the "<u>DIP Lenders</u>" and, together with the DIP Administrative Agent, the "<u>DIP Secured Parties</u>, together with the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, the "<u>Secured Parties</u>"), along with any other agreements, instruments, pledge agreements, guarantees, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (including any Loan Documents (as defined in the DIP Credit Agreement); each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Credit Agreement, the "<u>DIP Loan Documents</u>"));

(c)      authorizing the DIP Borrower to incur, and for the Guarantors (as defined in the DIP Credit Agreement, in such capacities, the "<u>DIP Guarantors</u>," and, together with the DIP Borrower, in such capacities, the "<u>DIP Loan Parties</u>") to guarantee on an unconditional joint and several basis, the principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts (including, without limitation, all Obligations (as defined in the DIP Credit Agreement)), as and when due and payable under and in accordance with each of the DIP Loan Documents (collectively, the "<u>DIP Obligations</u>");

(d)     authorizing the DIP Loan Parties to execute, deliver, and perform under the DIP Credit Agreement and all other DIP Loan Documents, and to perform such other and further acts as may be necessary or desirable in connection with this Final Order, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

(e)     granting to the DIP Administrative Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below), as applicable, in all DIP Collateral (as defined below), subject to the Carve Out (as defined below), which DIP Liens shall have the priority set forth herein;

(f)     granting to the DIP Administrative Agent, for the benefit of the DIP Secured Parties, and authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims against each of the DIP Loan Parties, on a joint and several basis, in respect of all DIP Obligations, in each case, in accordance with and subject to the Carve Out and the terms hereof, which superpriority claims are junior and subordinate to the Administrative Adequate Protection Claims, and the Hedge Claims (as defined below) but senior to any and all other claims against the Debtors unless otherwise provided herein;

(g)     authorization, upon entry of this Final Order, to grant adequate protection liens on proceeds and property recovered in respect of the claims and causes of action held by the DIP Loan Parties arising under chapter 5 of the Bankruptcy Code or any other state or federal law (collectively, the "Avoidance Actions");

(h)     modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the DIP Loan Documents;

(i)     except to the extent of the Carve Out, and upon entry of this Final Order, the waiver of all rights to surcharge any Prepetition Collateral, Collateral (as defined herein) or DIP Collateral under sections 506(c) or 552(b) of the Bankruptcy Code or any other applicable principle of equity or law; and

(j)     waiver of any applicable stay with respect to the effectiveness and enforceability of this Final Order (including a waiver pursuant to Bankruptcy Rule 6004(h));

an interim hearing (the "Interim Hearing") having been held by the Court on July 27, 2020 at 3:30 p.m. Houston time; and the Final Hearing having been held on August 28, 2020 at 11:00 a.m. Houston time (the "Final Hearing") pursuant to Bankruptcy Rule 4001 and the Complex Case Rules, and notice of the Motion and the relief sought therein having been given by the Debtors as set forth in this Final Order; and the Court having considered the Budget (as defined

herein) filed and served by the Debtors in accordance with the Complex Case Rules, offers of proof, evidence adduced, and the statements of counsel at the Interim Hearing; and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions herein contained is necessary and essential to enable the Debtors to preserve the value of the Debtors' businesses and assets and that such relief is fair and reasonable and that entry of this Final Order is in the best interest of the Debtors and their respective estates and creditors; and due deliberation and good cause having been shown to grant the relief sought in the Motion,

### IT IS HEREBY FOUND AND DETERMINED THAT:

A.      **Petition Date.** On July 26, 2020 (the "Petition Date"), ROC and Rosehill Resources Inc. ("RRI") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas. Each Debtor has continued with the management and operation of its businesses and properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Cases.  To date, the office of the U.S. Trustee (as hereinafter defined) has not appointed an official committee of unsecured creditors in the Cases (if any, the "Committee").

B.      **Jurisdiction and Venue.** Consideration of the Motion constitutes a "core-proceeding" as defined in 28 U.S.C. § 157(b)(2). This Court has jurisdiction over the cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Venue for the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      **Credit Agreements.**

Prior to the Petition Date, the Prepetition First Lien Lenders (as defined herein) made certain loans and advances pursuant to and in accordance with the terms and conditions of that certain Amended and Restated Credit Agreement, dated as of March 28, 2018 (as heretofore amended, restated, or otherwise modified from time to time, the "First Lien Credit Agreement," and together with all other documentation executed in connection therewith, including without limitation, the Prepetition First Lien Security Documents (as defined herein), all other Loan Documents (as defined in the First Lien Credit Agreement), including the Intercreditor Agreement (as defined herein), the Secured Swap Agreements (as defined in the First Lien Credit Agreement) and the Secured Cash Management Agreements (as defined in the First Lien Credit Agreement), collectively, the "Prepetition First Lien Credit Documents"), among ROC, as the borrower (in such capacity, the "Borrower"), RRI, the First Lien Administrative Agent, the lenders from time to time party thereto (such lenders, the "Prepetition First Lien Lenders"), and the issuer of letters of credit thereunder (the "Issuing Bank") (the First Lien Administrative Agent, the Prepetition First Lien Lenders, the Issuing Bank and the other Secured Parties (as defined in the First Lien Credit Agreement), collectively, the "Prepetition First Lien Secured Parties").

Prior to the Petition Date, ROC issued notes to the Prepetition Second Lien Holders (as defined herein) pursuant to and in accordance with the terms and conditions of that certain Note Purchase Agreement, dated as of December 8, 2017 (as heretofore amended, restated, or otherwise modified from time to time, the "Second Lien NPA," and together with all other documentation executed in connection therewith, including without limitation, that certain Security Agreement, dated as of December 8, 2017, all Mortgages (as defined in the

Second Lien NPA), and all other Note Documents (as defined in the Second Lien NPA), including the Intercreditor Agreement (as defined herein), the "<u>Prepetition Second Lien Note Documents</u>" and, together with the Prepetition First Lien Credit Documents, the "<u>Administrative Credit Documents</u>"), among ROC, as the issuer, RRI, the Second Lien Administrative Agent, and the holders from time to time party thereto (such holders, the "<u>Prepetition Second Lien Holders</u>", and together with the Prepetition First Lien Lenders, the "<u>Prepetition Lenders</u>") (the Second Lien Administrative Agent, the Prepetition Second Lien Holders, and the other Secured Parties (as defined in the Second Lien NPA), collectively, the "<u>Prepetition Second Lien Secured Parties</u>", and together with the Prepetition First Lien Secured Parties, the "<u>Prepetition Secured Parties</u>").

D.    **Debtors' Admissions With Respect to the Prepetition First Lien Secured Indebtedness.** Subject only to the rights of parties in interest specifically set forth in paragraph 27 of this Final Order (and subject to the limitations thereon contained in such paragraph), the Debtors admit, stipulate and agree that:

As of the Petition Date, Rosehill, as the Borrower under the Prepetition First Lien Credit Documents (the "<u>Prepetition Loan Party</u>"), was justly and lawfully indebted and liable, without defense, counterclaim, or offset of any kind, to the Prepetition First Lien Secured Parties in the aggregate principal amount of approximately $226,428,594, plus any accrued interest, fees, and other amounts that may be due and payable thereunder, including amounts owing for cash management agreements and prepetition interest rate hedges secured by or intended to be secured by the same collateral securing the obligations thereunder (collectively, the "<u>Prepetition First Lien Secured Indebtedness</u>"). The Prepetition First Lien Secured Indebtedness includes any and all principal amounts owing or outstanding under the First Lien Credit Agreement, interest on, fees and other costs, expenses, and charges owing in respect of, such amounts, and any and all obligations and liabilities, contingent or otherwise, owed in respect of the letters of credit, swap obligations, banking services and other cash management agreements, or other obligations outstanding thereunder. The Prepetition First Lien Secured Indebtedness, including the amounts specified in this paragraph, constitutes the legal, valid, and binding obligations of the Prepetition Loan Party, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), without objection, offset, defense, or counterclaim of any kind or nature to the Prepetition First Lien Secured Indebtedness. The Prepetition Loan Party does not have, nor shall it assert, any claim,

counterclaim, setoff, or defense of any kind, nature, or description that would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition First Lien Secured Indebtedness. The Prepetition First Lien Secured Indebtedness and any amounts previously paid to any Prepetition First Lien Secured Party pursuant to the terms of the Prepetition First Lien Credit Documents, on account thereof, or with respect thereto are not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable non-bankruptcy law, except as provided in the Prepetition First Lien Credit Documents or this Final Order.

E.  **Debtors' Admissions With Respect to the Prepetition Second Lien Secured Indebtedness.** Subject only to the rights of all parties in interest specifically set forth in paragraph 27 of this Final Order (and subject to the limitations thereon contained in such paragraph), the Debtors admit, stipulate and agree that:

As of the Petition Date, ROC, as the Issuer under the Prepetition Second Lien Note Documents (the "Prepetition Note Party"), was justly and lawfully indebted and liable, without defense, counterclaim, or offset of any kind, to the Prepetition Second Lien Secured Parties in the aggregate principal amount of $100,000,000.00, plus any accrued interest, fees (including the Repayment Fee (as defined in the Second Lien NPA)), expenses, and other amounts that may be due and payable thereunder (collectively, the "Prepetition Second Lien Secured Indebtedness"). The Prepetition Second Lien Secured Indebtedness includes any and all principal amounts owing or outstanding under the Second Lien NPA, interest on, fees and other costs, expenses, and charges owing in respect of, such amounts, and any and all other obligations outstanding thereunder. The Prepetition Second Lien Secured Indebtedness, including the amounts specified in this paragraph, constitutes the legal, valid, and binding obligations of the Prepetition Note Party, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), without objection, offset, defense, or counterclaim of any kind or nature to the Prepetition Second Lien Secured Indebtedness. The Prepetition Note Party does not have, nor shall it assert, any claim, counterclaim, setoff, or defense of any kind, nature, or description that would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Second Lien Secured Indebtedness. The Prepetition Second Lien Secured Indebtedness and any amounts previously paid to any Prepetition Second Lien Secured Party pursuant to the terms of the Second Lien NPA, on account thereof, or with respect thereto are not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or any other applicable non-bankruptcy law, except as provided in the Prepetition Second Lien Note Documents or this Final Order.

F.  **Debtors' Admissions With Respect to Collateral and Liens.** Subject only to the rights of parties in interest specifically set forth in paragraph 27 of this Final Order (and subject

to the limitations thereon contained in such paragraph), the Debtors admit, stipulate and agree that:

    i.    Pursuant to (i) that certain Second Amended and Restated Security Agreement, dated as of March 28, 2018, by and between ROC and the First Lien Administrative Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Security Agreement"), and (ii) all Mortgages (as defined in the First Lien Credit Agreement) securing the Prepetition Loan Party's obligations under the Prepetition First Lien Credit Documents (such Mortgages, together with the First Lien Security Agreement, and all other Security Instruments (as defined in the First Lien Credit Agreement), the "Prepetition First Lien Security Documents"), the Prepetition Loan Party granted senior security interests in, and continuing, valid, binding, enforceable and perfected first priority liens on, certain assets of the Prepetition Loan Party (as more specifically defined below, the "Prepetition First Lien Collateral," and together with assets securing the Prepetition Second Lien Note Documents, the "Prepetition Collateral") to and/or for the benefit of the Prepetition First Lien Secured Parties (the "Prepetition First Liens"), subject only to Permitted Prior Liens (as defined below). The Prepetition First Lien Collateral consists of substantially all of the assets of the Prepetition Loan Party including, without limitation, (i) at least 95% (by value) of the Proved Reserves (as defined in the First Lien Credit Agreement) of the Prepetition Loan Party evaluated in the most recent Reserve Report (as defined in the First Lien Credit Agreement), (ii) at least 95% (by value) of the Proved Developed Producing Reserves (as defined in the First Lien Credit Agreement) of the Prepetition Loan Party evaluated in the most recent Reserve Report, (iii) at least 90% of the total gross acreage of the Prepetition Loan Party, (iv) substantially all of the Prepetition Loan Party's Midstream Properties (as defined in the First Lien Credit Agreement) and any infrastructure or related oil and gas properties, (v) any other of the Prepetition Loan Party's Oil and Gas Properties (as defined in the First Lien Credit Agreement) requested by the First Lien Administrative Agent from time to time with a fair market value in excess of $2,000,000, and (vi) substantially all personal property of the Prepetition Loan Party and all other assets of the Prepetition Loan Party, in addition to the assets described in clauses (i) through and including (v) above, in or upon which a lien, mortgage, deed of trust, or other security interest has been granted in favor or for the benefit of the Prepetition First Lien Secured Parties in connection with, pursuant to, or under the applicable Prepetition First Lien Credit Documents that existed as of the Petition Date and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents, and profits.

ii.  The Prepetition First Lien Credit Documents are valid and binding agreements and obligations of the Prepetition Loan Party and RRI, as applicable, and the Prepetition First Liens constitute valid, binding, enforceable, and perfected first priority security interests and liens, which are not subject to avoidance, recharacterization, recovery, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or any other applicable non-bankruptcy law, except as provided in this Final Order.

iii.  Pursuant to (i) that certain Security Agreement, dated as of December 8, 2017, by and between ROC and the Second Lien Administrative Agent, for the benefit of itself and the other Prepetition Second Lien Secured Parties (as amended, restated, supplemented, or otherwise modified from time to time, the "Second Lien Security Agreement"), and (ii) all Mortgages (as defined in the Second Lien NPA) securing the Prepetition Note Party's obligations under the Prepetition Second Lien Note Documents (such Mortgages, together with the Second Lien Security Agreement, and all other Security Instruments (as defined in the Second Lien NPA), the "Prepetition Second Lien Security Documents"), the Prepetition Note Party granted senior security interests in and, continuing, valid, binding, enforceable and perfected second priority liens on, certain assets of the Prepetition Note Party (as more specifically defined below, the "Prepetition Second Lien Collateral," and together with assets securing the Prepetition First Lien Credit Documents, the "Prepetition Collateral") to and/or for the benefit of the Prepetition Second Lien Secured Parties (the "Prepetition Second Liens"), subject only to Permitted Prior Liens (as defined below) and the Prepetition First Liens on the terms set forth in the Intercreditor Agreement (as defined herein). The Prepetition Second Lien Collateral consists of substantially all of the assets of the Prepetition Loan Party including, without limitation (i) at least 95% (by value) of the Proved Reserves (as defined in the Second Lien NPA) of the Prepetition Note Party evaluated in the most recent Reserve Report (as defined in the Second Lien NPA), (ii) at least 95% (by value) of the Proved Developed Producing Reserves (as defined in the Second Lien NPA) of the Prepetition Note Party evaluated in the most recent Reserve Report, (iii) at least 90% of the total gross acreage of the Prepetition Note Party, (iv) substantially all of the Prepetition Note Party's Midstream Properties (as defined in the Second Lien NPA) and any infrastructure or related oil and gas properties,, (v) any other of the Prepetition Note Party's Oil and Gas Properties (as defined in the Second Lien NPA) requested by the Second Lien Administrative Agent from time to time with a fair market value in excess of $2,000,000, and (vi) substantially all personal property of the Prepetition Note Party and all other assets of the Prepetition Note Party, in addition to the assets described in clauses (i) through and including (v) above, in or upon which a lien, mortgage, deed of trust, or other security interest has been granted in favor or for the benefit of the Prepetition

Second Lien Secured Parties in connection with, pursuant to, or under the applicable Prepetition Second Lien Note Documents that existed as of the Petition Date and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents, and profits.

iv.     The Prepetition Second Lien Note Documents are valid and binding agreements and obligations of the Prepetition Note Party and RRI, as applicable, and the Prepetition Second Liens constitute valid, binding, enforceable, and perfected second priority security interests and liens, which are not subject to avoidance, recharacterization, recovery, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or any other applicable non-bankruptcy law, except as provided in the Administrative Credit Documents or this Final Order.

v.      The First Lien Administrative Agent has properly perfected its security interests and Prepetition First Liens in and on the Prepetition First Lien Collateral by taking possession of, or obtaining control over, certain assets, and/or by filing UCC-1 financing statements, mortgages, or other required documents against the Prepetition Loan Party, and such Prepetition First Lien Collateral in the proper state or county offices for the perfection of such security interests and Liens.

vi.     The Second Lien Administrative Agent has properly perfected its security interests and Prepetition Second Liens in and on the Prepetition Second Lien Collateral by taking possession of, or obtaining control over, certain assets, and/or by filing UCC-1 financing statements, mortgages, or other required documents against the Prepetition Note Party, and such Prepetition Second Lien Collateral in the proper state or county offices for the perfection of such security interests and Lien.

G.      **Debtors' Admissions With Respect to Cash Collateral.** Subject only to the rights

of parties in interest specifically set forth in paragraph 27 of this Final Order (and subject to the

limitations thereon contained in such paragraph), the Debtors admit, stipulate and agree that all

of the Prepetition Loan Party's cash, including all cash proceeds of the Prepetition Collateral, the

Prepetition Loan Party's banking, checking or other deposit accounts with financial institutions

(in each case, other than trust, escrow and custodial funds held as of the Petition Date) as of the

Petition Date or deposited into the Prepetition Loan Party's banking, checking or other deposit

accounts with financial institutions after the Petition Date that is property of the Prepetition Loan

Party constitutes Cash Collateral of the Prepetition Administrative Agents, for the benefit of their respective Prepetition Secured Parties, within the meaning of section 363(a) of the Bankruptcy Code. The Prepetition Administrative Agents, for the benefit of their respective Prepetition Secured Parties, are entitled, pursuant to sections 105, 361, 362 and 363(e) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in value of their respective interests in the Prepetition Collateral as of the Petition Date resulting from the use of Cash Collateral, the use, sale or lease of the Prepetition Collateral and/or the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code. The foregoing shall not, nor shall any other provision of this Final Order be construed as, a determination or finding that there has been or will be any diminution in value of Prepetition Collateral (including Cash Collateral) and the rights of all parties as to such issues are hereby preserved.

H.    **Releases; Investigation.**  Each of the Debtors hereby forever waives and releases any and all Claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against each of the Secured Parties (solely in their capacities as such) arising prior to the date of the entry of this Final Order, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law. Subject to paragraph 27 of this Final Order, (and subject to the limitations thereon contained in such paragraph), the foregoing release shall be binding on the Debtors' estates, the Committee, if any, all parties-in-interest, and any successor-in-interest to any Debtor or any Debtor's estate, including, but not limited to any chapter 7 or chapter 11 trustee or examiner.

I.    **Corporate Authority.** Subject to entry of this Final Order, each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

J.    **Need for Postpetition Financing and Use of Cash Collateral.** The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and the Complex Case Rules and have an immediate need to enter into the DIP Facility and obtain use of the Prepetition Collateral, including the Cash Collateral (in the amount and in the manner set forth in the Budget (as defined herein) and this Final Order) in order to, among other things, preserve and maintain the value of their assets and businesses and maximize the return to all creditors. An immediate and critical need exists for the Debtors to use the Cash Collateral, consistent with the Budget and this Final Order, for working capital purposes, to pay costs and fees under the DIP Facility and this Final Order, for other general corporate purposes, and to satisfy the costs and expenses of administering the Cases. The ability of the Debtors to obtain liquidity through the use of the proceeds of the DIP Facility and the Cash Collateral is vital to the Debtors and their efforts to maximize the value of their assets. Absent entry of this Final Order, the Debtors' estates and reorganization efforts will be immediately and irreparably harmed.  The terms of the proposed DIP Facility pursuant to the DIP Loan Documents and this Final Order are fair and reasonable, reflect each Debtor's exercise of its prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

K.    **No Credit Available on More Favorable Terms.**  The Debtors have been unable to obtain financing and other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents. The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain adequate credit for money borrowed (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code or (b) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien. Postpetition financing is not otherwise available without granting the DIP Administrative Agent, for the benefit of the respective DIP Secured Parties and subject to the Carve Out, Administrative Adequate Protection Liens, Hedge Liens, Prepetition First Liens and Prepetition Second Liens, (1) the DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Claims (as defined below), and (3) the other protections set forth in this Final Order. After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

      L.    **Use of Proceeds of the DIP Facility and Cash Collateral.**  As a condition to entry into the DIP Loan Documents, the extension of credit and other financial accommodations made under the DIP Facility and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), each of the DIP Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties require, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facility, and all other cash or funds of the Debtors, shall be used solely in accordance with the terms and conditions of this Final Order and the DIP Loan Documents, and only for the expenditures set forth in and consistent with the Budget (as defined below) (subject to permitted variances pursuant to paragraph 6 of this Final Order and Section 9.25 of the DIP Credit Agreement (the "Permitted Variances")), and for no other purpose.

M. **Business Judgment and Good Faith Pursuant to Section 364(e).** Based on the Motion, the First Day Declaration, the Finger Declaration, and the record presented to the Court at the Interim Hearing and the Final Hearing, (i) the extension of credit and other financial accommodations made under the DIP Facility and the DIP Loan Documents, (ii) the terms of the DIP Facility, (iii) the fees and other amounts paid and to be paid thereunder, (iv) the terms of adequate protection granted to the Prepetition Secured Parties, (v) the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral), and (vi) the Cash Collateral arrangements described therein and herein, in each case, pursuant to this Final Order and the DIP Loan Documents: (a) are fair, reasonable, and the best available to the Debtors under the circumstances; (b) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; (c) are supported by reasonably equivalent value and fair consideration; and (d) represent the best financing available under the circumstances. The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties. The use of Prepetition Collateral (including Cash Collateral) and the credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Secured Parties and the Prepetition Secured Parties are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order.

N. **Notice.** Notice of the requested relief sought at the Interim Hearing and the Final Hearing was provided by the Debtors to: (a) the Office of the U.S. Trustee for the Southern District of Texas (the "U.S. Trustee"), (b) counsel to the First Lien Administrative Agent, (c)

counsel to the Second Lien Administrative Agent, (d) counsel to EIG Management Company, LLC ("EIG") on behalf of the Prepetition Second Lien Holders, (e) counsel to the DIP Administrative Agent, (f) the parties included on the Debtors' consolidated list of the 30 largest unsecured creditors, (g) the United States Attorney's Office for the Southern District of Texas, (h) the Internal Revenue Service, (i) the United States Securities and Exchange Commission, (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business, and (k) the state attorneys general for the states in which the Debtors conduct business. Given the nature of the relief sought, the foregoing notice of the Interim Hearing was, in the Debtors' good faith belief, the best available under the circumstances and complies with Bankruptcy Rules 2002, 4001(b) and (d) and 9014, and section 102(1) of the Bankruptcy Code as required by sections 361, 363 and 364 of the Bankruptcy Code. No further notice of, or hearing on, the relief sought at the Interim Hearing or the Final Hearing and the relief granted herein is necessary or required.

O.      **Consent by Prepetition Secured Parties.** The First Lien Administrative Agent, as collateral agent for the Prepetition First Lien Secured Parties, consents to the Prepetition Loan Party's use of Cash Collateral, to entry of this Final Order, and the entry into the DIP Facility and the DIP Loan Documents, solely in accordance with and subject to the terms and conditions provided for in this Final Order.  The Second Lien Administrative Agent, as collateral agent for the Prepetition Second Lien Secured Parties, consents to the Prepetition Loan Party's use of Cash Collateral, to entry of this Final Order, and the DIP Loan Parties' entry into the DIP Facility and the DIP Loan Documents, solely in accordance with and subject to the terms and conditions provided for in this Final Order.

P.      **Relief Essential; Best Interest.** The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2) and Bankruptcy Local Rule 4001-2. The relief requested in the Motion (and as provided in this Final Order) is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of the Debtors' assets and the property of their estates. It is in the best interest of the Debtors' estates that the Debtors be allowed to enter into the DIP Facility and use the proceeds thereof and the Cash Collateral under the terms hereof. The Debtors have demonstrated good and sufficient cause for the relief granted herein.

Q.      **Arm's-Length, Good Faith Negotiations.** The terms of this Final Order were negotiated in good faith and at arm's-length between the Debtors, the Prepetition First Lien Secured Parties, the Prepetition Second Lien Parties, and the DIP Secured Parties.

**NOW, THEREFORE, UPON THE RECORD OF THE PROCEEDINGS HERETOFORE HELD BEFORE THIS COURT WITH RESPECT TO THE MOTION, THE EVIDENCE ADDUCED AT THE INTERIM HEARING AND THE FINAL HEARING, AND THE STATEMENTS OF COUNSEL THEREAT, IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted.** The Motion is granted in accordance with the terms of this Final Order. Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled and all reservations of rights included therein, are hereby denied and overruled with prejudice.

2.      **Authorization of DIP Facility.**

(a)      Subject to the terms and conditions of this Final Order, each of the DIP Loan Parties are hereby authorized to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Facility and the DIP Loan Documents to which they are party. The DIP

Loan Documents and this Final Order govern the financial and credit accommodations to be provided to the DIP Loan Parties by the DIP Lenders in connection with the DIP Facility.

(b)     The DIP Credit Agreement and each of the other DIP Loan Documents are hereby approved upon execution thereof.

(c)     The DIP Borrower is authorized to incur, and the DIP Guarantor is hereby authorized to unconditionally guarantee, on a joint and several basis, all of the DIP Loan Parties' DIP Obligations on account of such incurrence under the DIP Facility, an aggregate principal amount of $17,500,000 in new money DIP Loans on final basis, together with applicable interest, protective advances, expenses, fees, and other charges payable in connection with the DIP Facility (the "DIP Financing"), as applicable, in each case, subject to the terms and conditions set forth in this Final Order and the DIP Loan Documents.

(d)     Without limiting the foregoing, and without the need for further approval of this Court, each DIP Loan Party is authorized to perform all acts to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of pledge and security agreements, mortgages or deeds of trust, and financing statements), and to pay all fees or expenses that may be required, necessary, or desirable for the DIP Loan Parties to implement the terms of, perform their obligations under or effectuate the purposes of and transactions contemplated by this Final Order, the DIP Facility, and the DIP Loan Documents (as applicable) in accordance herewith and therewith, including, without limitation:

(i)     the execution and delivery of, and performance under, the DIP Loan Documents;

(ii)     the execution and delivery of, and performance under, one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case, as the DIP Loan Parties and the requisite DIP Secured Parties (in accordance with and subject to the terms of the applicable DIP Loan Documents) may agree (and subject to the

consent of the Required Consenting Revolving Credit Agreement Lenders[3] solely to the extent such consent right is expressly provided by the RSA), it being understood that no further approval of the Court shall be required for non-material authorizations, amendments, waivers, consents, or other modifications to and under the DIP Loan Documents (or with respect to any fees and other expenses (including any attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities, and other obligations paid in accordance and connection therewith);

(iii)   subject to paragraphs 5(f), 5(g) and 5(h)of this Final Order, the non-refundable and irrevocable payment of any and all fees, costs, and expenses payable pursuant to the DIP Loan Documents, including, without limitation, (a) any closing fees, upfront fee, exit fee, prepayment fee, unused line fees, ticking fees, arrangement fees, structuring fees, duration fees, commitment fees, backstop fees, servicing fees, audit fees, appraisal fees, servicing fees, liquidator fees, agency fees, prepayment premiums, or similar amounts (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of the Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, or other claim, cause of action, or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Loan Documents, and (b) the reasonable and documented invoiced fees, costs, and expenses as may be due from time to time of the DIP Administrative Agent or the DIP Lenders, including without limitation, the reasonable and documented fees and expenses of (A) the following professionals (whether or not such fees arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated): Kirkland & Ellis LLP; Zack A. Clement PLLC; Intrepid Financial Partners, LLC; Rothschild & Co.; Shipman & Goodwin LLP and local counsel, if any, to the DIP Administrative Agent (collectively, each of the fees and expenses described in the foregoing clauses, the "DIP Fees and Expenses"), in each case, without the need to file retention or fee applications, and without the need to provide notice to any party or obtain further Court approval; *provided* that the DIP Fees and Expenses incurred after the Petition Date by professionals for the DIP Administrative Agent or DIP Lenders shall be subject to the review process set forth in paragraph 34 of this Final Order;

(iv)   subject to the Carve Out, the Administrative Adequate Protection Liens and the Administrative Adequate Protection Claims, Hedge Liens and Hedge Claims, Prepetition First Liens and Prepetition First Lien Secured Indebtedness and Prepetition Second Liens and, Prepetition Second Lien Secured Indebtedness, the granting and perfection of the DIP Liens (as defined below), and the granting of the DIP Claims (as defined below), in each case, as set forth herein and in the DIP Loan Documents;

(v)   the performance of all other acts necessary, required, or desirable to implement the DIP Facility and to facilitate the transactions contemplated by the DIP Loan Documents and this Final Order in accordance therewith and herewith; and

[3] "Required Consenting Revolving Credit Agreement Lenders" shall mean the Prepetition First Lien Secured Parties holding at least 66.67% of the principal loan amount of the Prepetition First Lien Secured Indebtedness.

(vi)  the non-refundable and irrevocable payment of any and all fees, costs, and expenses payable to Tema Oil and Gas Company, as a DIP Lender; provided that such fees (other than any Upfront Fee or Backstop Fee payable under the Fee Letter (as defined in the DIP Credit Agreement)), costs, and expenses shall be treated as "Consenting Tema Restructuring Expenses" under the plan of reorganization filed by the Debtors in accordance with the Restructuring Support Agreement (the "<u>Plan</u>") and shall be paid only to the extent permitted under the Plan.

(e)     No DIP Secured Party shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Facility, and each DIP Secured Party may rely upon each DIP Loan Party's representations that the amount of the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Final Order, the DIP Loan Documents, and Bankruptcy Rule 4001(c)(2).

3.     **<u>DIP Obligations.</u>** The DIP Loan Documents constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Cases, or any successor cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Cases or any such successor cases (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties in interest, in each case, in accordance with the terms thereof and this Final Order. Upon execution and delivery of the DIP Loan Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by any of the DIP Loan Parties to any of the DIP Administrative Agent or DIP Lenders, in each case, under, or secured by, and in accordance with, the DIP Loan Documents or this Final Order, including all principal, interest, costs, fees, expenses, and other amounts under the DIP Loan Documents (including this Final Order). The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations. Subject to paragraphs 5(f), 5(g), 5(h) and  15 of this Final

Order, the DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease during the continuation of a DIP Termination Event (as defined herein) or the occurrence and continuance of any event or condition set forth in paragraph 15 of this Final Order. No obligation, payment, transfer, or grant of security under the DIP Loan Documents or this Final Order to the DIP Secured Parties shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law unless in accordance with paragraphs 5(f), 5(g), 5(h), 15 or 16 of this Final Order.

4.      **No Obligation to Extend Credit.** The DIP Secured Parties shall have no obligation to make any loan or advance under the applicable DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit by the applicable DIP Secured Parties under the applicable DIP Loan Documents and this Final Order have been satisfied in full or waived in accordance with the terms of the DIP Loan Documents.

5.      **DIP Liens.**

(a)      Subject to paragraphs 5(f), 5(g) 5(h), and 16, as security for the DIP Obligations, effective as of the date of the Interim Order and closing of the DIP Facility, as set forth more fully in this Final Order, the DIP Administrative Agent, for the benefit of the DIP Secured Parties, is hereby granted (without the necessity of the execution by the DIP Loan Parties or the filing or recordation of mortgages, security agreements, lockbox or control

agreements, financing statements, or any other instruments or otherwise by the DIP Administrative Agent or the DIP Lenders) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "DIP Liens") in the DIP Collateral (as defined below), as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations:

      (i) *Liens on Unencumbered Property.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected first-priority security interest in and lien upon (x) all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible, real and personal prepetition and postpetition property of each DIP Loan Party that, on or as of the Petition Date, was not subject to valid, perfected and non-avoidable liens or was not subject to valid, non-avoidable liens perfected subsequent to the Petition Date the priority and perfection of which relates back to a date prior to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and, to the extent applicable, section 362(b)(18) of the Bankruptcy Code, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, and (y) upon entry of this Final Order, Avoidance Actions Proceeds (as defined below), subject and subordinate only to (a) the Administrative Adequate Protection Liens, (b) the Hedge Liens and (c) the Carve Out; *provided,* that, upon entry of this Final Order, the DIP Collateral shall include the proceeds of Claims and Causes of Action[4] under chapter 5 of the Bankruptcy Code, whether pursuant to federal law or applicable state law, of the DIP Loan Parties or their estates and avoidance actions proceeds (collectively, the "Avoidance Actions Proceeds") (all of the foregoing property, collectively, the "Unencumbered Property"); and

---

[4]   As used in this Final Order, "Causes of Action" means any action, Claim, cause of action, controversy, demand, right, action, lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, and license of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Closing Date, in contract or in tort, in law (whether local, state, or federal U.S. or non-U.S. law) or in equity, or pursuant to any other theory of local, state, or federal U.S. or non-U.S. law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction law, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code or similar local, state, or federal U.S. or non-U.S. law; (d) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of title 11 of the United States Code; (e) any state or foreign law pertaining to actual or constructive fraudulent transfer, fraudulent conveyance, and (f) any "lender liability" or equitable subordination claims or defenses.

(ii) *Junior DIP Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, enforceable, fully-perfected junior security interest in and lien upon (x) all of the DIP Loan Parties' right, title, and interest in, to, and under any tangible and intangible, real and personal prepetition and postpetition property of each DIP Loan Party, other than the Unencumbered Property, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, and (y) upon entry of this Final Order, Avoidance Actions Proceeds (as defined below) ((x) and (y), together with Unencumbered Property, the "DIP Collateral"), subject and subordinate only to (a) the Prepetition First Liens and Prepetition Second Liens, (b) Permitted Prior Liens (as defined below, solely to the extent such liens are expressly permitted to be senior to the respective DIP Liens under the DIP Loan Documents), (c) the Hedge Liens, (d) the Administrative Adequate Protection Liens and (e) the Carve Out; *provided,* that, upon entry of this Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions Proceeds.

(b)     For the avoidance of doubt, the term "DIP Collateral" shall include all assets and properties of each of the DIP Loan Parties of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the DIP Loan Parties, whether prior to or after the Petition Date, whether owned by or to, or leased from or to, the DIP Loan Parties, and wherever located, including, without limitation, each of the DIP Loan Parties' rights, title and interests in (i) all Prepetition Collateral, (ii) all "DIP Collateral" as defined in the DIP Loan Documents, and (iii) all proceeds, products, offspring, and profits of each of the foregoing and all accessions to, substitutions, and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any DIP Loan Party from time to time with respect to any of the foregoing.

(c)     Except as set forth in paragraphs 5(a) 5(f), 5(g), 5(h), and 16 of this Final Order, the DIP Liens (i) shall not be made subject to or *pari passu* with (A) any lien or security interest heretofore or hereinafter granted in any of the Cases or any Successor Cases, and shall be valid and enforceable against the DIP Loan Parties, their estates, any trustee, or any other estate

representative appointed or elected in the Cases, or any Successor Cases and/or upon the dismissal of any of the Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the DIP Loan Parties and their estates under section 551 of the Bankruptcy Code or otherwise, or (C) any intercompany or affiliate lien, and (ii) upon entry of this Final Order, shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

(d)     Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent, or the payment of any fees or obligations to, any governmental entity or non-governmental entity in order for the DIP Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens or Adequate Protection Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Loan Parties, in favor of the DIP Secured Parties or the Prepetition Secured Parties in accordance with the terms of the DIP Loan Documents and this Final Order.

(e)     **DIP Claims.** Subject to paragraphs 5(f), 5(g), 5(h) and 16, effective as of the date of the Interim Order, the DIP Administrative Agent (on behalf of the DIP Secured Parties) is hereby granted, pursuant to section 364(c)(1) and 364(e) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the DIP Loan Parties' Cases and any Successor Cases thereof on account of the DIP Obligations, junior and subordinate to the Carve Out, the Administrative Adequate Protection Claims, and the Hedge Claims, but with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114,

or any other provisions of the Bankruptcy Code and any other claims against the DIP Loan Parties (the "DIP Claims"); *provided* that upon entry of this Final Order, any DIP Claims shall be subject to any claims or charges arising under Bankruptcy Code sections 506(c).  Subject to paragraphs 5(f), 5(g), 5(h) and 16, the DIP Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  Subject to paragraphs 5(f), 5(g), 5(h) and 16, the DIP Claims shall have recourse against each of the DIP Loan Parties, on a joint and several basis.

      (f)     Notwithstanding anything to the contrary in this Final Order or the DIP Loan Documents, (i) nothing in this Final Order or any DIP Loan Document shall, or shall be deemed to, provide that the DIP Liens in any way prime the Administrative Adequate Protection Liens, the Hedge Liens, the Prepetition First Liens or the Prepetition Second Liens, (ii) until (x) the Prepetition First Lien Secured Indebtedness (other than contingent indemnity obligations as to which no claim has been asserted) and Hedge Claims are paid in full in cash and, in the case of Letters of Credit (as defined in the First Lien Credit Agreement) or Secured Swap Agreements (as defined in the First Lien Credit Agreement) or Secured Cash Management Agreements (as defined in the First Lien Credit Agreement), cash collateralized pursuant to arrangements satisfactory to the issuer(s) or holders thereof (the "Payment in Full of the First Lien Obligations") and (y) the Prepetition Second Lien Secured Indebtedness (other than contingent indemnity obligations as to which no claim has been asserted) are paid in full in cash, the DIP Obligations (whether principal, interest, or fees), other than DIP Obligations incurred pursuant to the Agent Fee Letter (as defined in the DIP Credit Agreement), may not be paid in cash or otherwise redeemed (other than in accordance with the conversion terms set forth in paragraph 5(h)), (iii) if the DIP Administrative Agent or any DIP Lender receives payment(s) in violation of the payment subordination provision

set forth above, the DIP Administrative Agent or such DIP Lender, as applicable, shall hold such amounts in trust for the benefit of (a) first, the Prepetition First Lien Secured Parties and shall promptly turn over such amounts to the First Lien Administrative Agent and (b) second, after the Payment in Full of the First Lien Obligations, the Prepetition Second Lien Secured Parties and shall promptly turn over such amounts to the Second Lien Administrative Agent.

(g)      Notwithstanding anything to the contrary in this Final Order or the DIP Loan Documents, prior to the Payment in Full of the First Lien Obligations, if the DIP Administrative Agent or any DIP Lender shall obtain possession of any DIP Collateral or shall realize any proceeds or payment in respect of any DIP Collateral, pursuant to the exercise of any rights or remedies with respect to the DIP Collateral or by the exercise of any rights available to it under applicable law or pursuant to this Final Order, at any time prior to the Payment in Full of the First Lien Obligations, then it shall hold such DIP Collateral, proceeds or payment in trust for the Prepetition First Lien Secured Parties and transfer such DIP Collateral, proceeds or payment, as the case may be, to the First Lien Administrative Agent as promptly as practicable but, in any event, within one (1) Business Day of demand.  After the Payment in Full of the First Lien Obligations, if the DIP Administrative Agent or any DIP Lender shall obtain possession of any DIP Collateral or shall realize any proceeds or payment in respect of any DIP Collateral, pursuant to the exercise of any rights or remedies with respect to the DIP Collateral or by the exercise of any rights available to it under applicable law or pursuant to this Final Order, at any time prior to the discharge of the Prepetition Second Lien Secured Indebtedness, then it shall hold such DIP Collateral, proceeds or payment in trust for the Prepetition Second Lien Secured Parties and transfer such DIP Collateral, proceeds or payment, as the case may be, to the Second Lien Administrative Agent as promptly as practicable.

(h)     Notwithstanding anything to the contrary in this Final Order or the DIP Loan Documents, the DIP Obligations on the Effective Date of the confirmed Plan, shall be converted to common equity in the reorganized Debtors (or an entity directly owning substantially all of the assets of the reorganized Debtors), paid in cash or discharged and extinguished, as applicable, pursuant to, and to the extent required by, the Plan.

6.      **Authorization to Use Proceeds of the DIP Facility and Cash Collateral; Budget Testing; Minimum Hedging Volumes.**

(a)     Subject to the terms and conditions of this Final Order, the Court hereby authorizes the DIP Loan Parties' use of Cash Collateral and proceeds of the DIP Facility, solely and exclusively in a manner consistent with this Final Order and the Budget (subject to the variances permitted pursuant to the Budget Covenant (as defined below)), and for no other purposes.

(b)     As used in this Final Order: (i) "Initial Budget" means the 13-week budget attached as **0** to the Interim Order and (ii) "Approved Budget" means the 13-week cash flow budget that is then in effect as set forth in paragraph 6(d) below, in the case of each of (i) and (ii), in form and substance satisfactory to the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders[5]) in their sole discretion.

(c)     By 5:00 p.m. Houston time on the third Business Day of each calendar week, commencing with the week following the week in which the Petition Date occurs, the DIP Loan Parties will provide an updated budget, consistent with the form of the Initial Budget and containing line items of sufficient detail to reflect the DIP Loan Parties' projected disbursements and projected cash receipts for the then-upcoming 13-week period (the "Budget Update") to the Requisite DIP Lenders (as defined in the DIP Credit Agreement, the "Majority DIP Lenders") and the First Lien Administrative Agent, the U.S. Trustee and any statutory committee appointed in these Cases.  Within one (1) Business Day of the Majority DIP Lenders' and the First Lien Administrative Agent's receipt of the Budget Update (or on such more frequent dates as may be requested by the Majority DIP Lenders or the First Lien Administrative Agent), the DIP Loan Parties and Opportune LLP will attend a teleconference with the Majority DIP Lenders and the First Lien Administrative Agent (and, if elected by either of the Majority DIP Lenders or the First Lien Administrative Agent, their respective financial advisors) to update them regarding compliance with the Budget Update and any other matters reasonably requested by any DIP Lender or the First Lien Administrative Agent.

---

[5]      "Required Consenting Revolving Credit Agreement Lenders" shall mean the Prepetition First Lien Secured Parties holding at least 66.67% of the principal loan amount of the Prepetition First Lien Secured Indebtedness.

(d)     By 5:00 p.m. Houston time on the date that is two (2) days prior to the Budget Approval Deadline (as defined in the DIP Credit Agreement), the DIP Loan Parties will provide to the DIP Administrative Agent, DIP Lenders and First Lien Administrative Agent, the U.S. Trustee and any statutory committee appointed in these Cases (A) an updated budget, consistent with the form of the Initial Budget and containing line items of sufficient detail to reflect the DIP Loan Parties' projected disbursements and projected cash receipts for the then-upcoming thirteen (13) week period (the "Interim Budget") and (B) all other information requested by the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) in form and substance satisfactory to the Majority DIP Lenders and First Lien Administrative Agent in their reasonable discretion. The Debtors hereby acknowledge and agree that any Interim Budget provided to the DIP Lenders and the First Lien Administrative Agent shall not amend, supplement or replace the applicable Approved Budget until the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) deliver a notice (which may be delivered by electronic mail) to the DIP Borrower stating that the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) have approved of such Interim Budget; provided, that if the Majority DIP Lenders or the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) do not provide such notice to the DIP Borrower, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as either the Bankruptcy Court orders alternative relief pursuant to dispute procedures agreed by the DIP Borrower, the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) or the subject Interim Budget is agreed to among the DIP Borrower, the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) in their sole discretion in accordance with this Final Order. Once such Interim Budget (or any alternate budget directed by the Bankruptcy Court) is so approved in writing by the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) in their sole discretion, it shall amend, supplement and replace the prior Approved Budget and shall thereafter constitute the Approved Budget. For the avoidance of doubt, the DIP Borrower's failure to obtain the Majority DIP Lenders' and the First Lien Administrative Agent's consent to an Interim Budget by the Budget Approval Deadline shall not constitute an Event of Default (as defined in the DIP Credit Agreement).

(e)     Beginning on the first Wednesday following the conclusion of the First Testing Period (the "First Variance Testing Date") and on each two (2) week anniversary of the First Variance Testing Date (each such date, a "Variance Testing Date"), in each case on or before 5:00 p.m. Houston time on such Variance Testing Date, the DIP Loan Parties will provide to the DIP Administrative Agent, DIP Lenders and First Lien Administrative Agent a variance report tested for the preceding two (2)-week period then ended as of the immediately preceding Friday (each such period, a "Testing Period" and each such report, a "Variance Report") (provided, that the first such Testing Period shall run from the day following the Petition Date through the second Friday thereafter (the date from the Petition Date through such second Friday, the "First Testing Period")), in form and substance satisfactory to the DIP Administrative Agent, the Majority DIP Lenders and the First Lien Administrative Agent (acting at the direction of the Required

Consenting Revolving Credit Agreement Lenders) in their reasonable discretion, detailing the following: (i) the aggregate disbursements in respect of each line item of the DIP Loan Parties and aggregate receipts in respect of each line item during the applicable Testing Period; (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements in respect of each line item made during such Testing Period by the DIP Loan Parties against the aggregate disbursements in respect of each line item for the Testing Period as set forth in the Approved Budget applicable to such Testing Period; and (iii) any variance (whether positive or negative, expressed as a percentage) between the aggregate receipts in respect of each line item received during such Testing Period by the DIP Loan Parties against the aggregate receipts in respect of each line item for the Testing Period as set forth in the Approved Budget applicable to such Testing Period, in each case of the foregoing clauses, with a detailed explanation of any such variance in form, substance and detail satisfactory to the Majority DIP Lenders and First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) in their reasonable discretion.

(f)     As of any Variance Testing Date, beginning with the First Variance Testing Date, the DIP Loan Parties shall not allow the actual cash disbursements made by the DIP Loan Parties in respect of any line-item during such Testing Period to be greater than fifteen-percent (15%) of the corresponding line-item for the DIP Loan Parties set forth in the Approved Budget for such Testing Period (each, the "Variance Limit"); provided, that the cash expenses and disbursements considered for determining compliance with this covenant shall exclude (w) royalty payments, production and ad valorem taxes, or other disbursements calculated based on the volume or amount of oil, gas, or natural gas liquid production, (x) the DIP Loan Parties' disbursements and expenses in respect of professional fees during such Testing Period, (y) interest, financing fees, and bank fees and service charges paid during such Testing Period and (z) net hedge settlements during such Testing Period. Additional variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to the written consent of the Majority DIP Lenders and First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) in their sole discretion. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email. The covenant described in this paragraph 6(f) shall be referred to herein as the "Budget Covenant". The DIP Loan Parties' failure to comply with the Budget Covenant will constitute an event of default under the DIP Credit Agreement.

(g)     The DIP Loan Parties will as soon as practical after the Petition Date (and in no case later than ten (10) Business Days after the Petition Date), enter into new Swap Agreements (as defined in the DIP Credit Agreement) (such new post-petition Swap Agreements, the "Postpetition Swap Agreements") with Prepetition First Lien Lenders (or their affiliates) (in their capacity as such, the "Hedge Providers") pursuant to standards agreed in advance by the DIP Loan Parties, the Majority DIP Lenders and the First Lien Administrative Agent pursuant to which the DIP Loan Parties have hedged notional volumes of not less than 70% of the reasonably anticipated projected production (based on the Initial Reserve Report, as defined in the DIP Credit Agreement) updated by the DIP Loan Parties to include wells brought into production and exclude wells permanently shut in (as determined by the DIP Borrower in its reasonable discretion), in each case prior to the closing date of the DIP Facility) of crude oil and natural gas, calculated

separately, from Proved Developed Producing Reserves of Oil and Gas Properties (each, as defined in the DIP Credit Agreement) of the DIP Loan Parties for each month during the subsequent twenty-four (24) calendar month period immediately following the Petition Date; provided that at least 50% of all such Postpetition Swap Agreements must be in the form of fixed for floating swaps and the remaining 50% may be in the form of costless collars or puts (each such Postpetition Swap Agreement and the obligations thereunder, collectively, to the extent entered into pursuant to an order of this Court authorizing, among other things, the Debtors to perform under prepetition interest rate swaps and enter into and perform under postpetition hedging agreements (the "Hedge Order"), the "Hedge Claims" and the liens securing such Hedge Claims, the "Hedge Liens").

7.    **Adequate Protection for the Prepetition Secured Parties.** In addition to all the existing security interests and liens granted to or for the benefit of the Prepetition Secured Parties in and with respect to their respective Prepetition Collateral, including the Cash Collateral, as adequate protection for, and to secure payment of an amount equal to, the Collateral Diminution (as defined herein), and as an inducement to the Prepetition Secured Parties to permit the Prepetition Loan Party's use of the Cash Collateral as provided for in this Final Order, the Prepetition Loan Party hereby grants the following adequate protection to the extent of any Collateral Diminution:

(a)    **Adequate Protection Liens.** Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), and subject in all cases to the Carve Out (as defined herein), effective as of the Petition Date and in each case perfected without the necessity of the execution by the Prepetition Loan Party (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control, each of the Prepetition Administrative Agents are hereby granted, for the benefit of their respective Prepetition Secured Parties, to secure payment of an amount equal to the Collateral Diminution, a valid, binding, continuing, enforceable, fully-perfected first priority senior (except as otherwise provided in this paragraph 7(a) below with respect to the Permitted Prior Liens) security interest in and lien on (all such liens and security interests, the "Administrative Adequate Protection Liens") the Prepetition Collateral and all other of the Prepetition Loan Party's now owned and hereafter-acquired real and personal property, assets and rights of any kind or nature, wherever located, whether encumbered or unencumbered, including, without limitation, all prepetition and postpetition property of the Prepetition Loan Party's estate, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, all equipment, all inventory, all oil, gas and other hydrocarbons and all products and substances derived therefrom (including all raw materials and work in process therefore, finished goods thereof, and materials used or consumed in the manufacture or production thereof), all goods, all accounts, cash, payment intangibles, deposit

accounts, accounts receivable, other rights to payment, general intangibles, contracts, servicing rights, servicing receivables, securities, chattel paper, all interest rate hedging agreements, commodity hedging agreements and similar agreements, owned real estate, real property leaseholds, oil and gas leases, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, claims and causes of action and all proceeds of the foregoing (excluding Avoidance Actions, but including proceeds of Avoidance Actions, upon entry of this Final Order) (all property identified in this paragraph 7(a) being collectively referred to as the "Collateral"), subject only to valid, perfected, unavoidable, and enforceable (i) prepetition liens (if any) which are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date, (ii) prepetition claims for set off and recoupment (if any) which are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date, and (iii) liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and that are senior to the Prepetition Secured Parties' liens or security interests as of the Petition Date and that are permitted under the First Lien Credit Agreement and the Second Lien NPA, as applicable, (the liens and claims in clauses (i), (ii), and (iii) above respectively, the "Permitted Prior Liens"), in which case the Administrative Adequate Protection Liens shall be immediately junior in priority to such Permitted Prior Liens.  The Administrative Adequate Protection Liens for the benefit of the Prepetition Second Lien Secured Parties shall be junior and subordinate to the Administrative Adequate Protection Liens for the benefit of the Prepetition First Lien Secured Parties and the Hedge Liens  on the same basis and pursuant to the same subordination terms as under that certain Intercreditor Agreement dated as of December 8, 2017 among the First Lien Administrative Agent as agent for the Prepetition First Lien Secured Parties, and the Second Lien Administrative Agent as agent for the Prepetition Second Lien Secured Parties (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement").

      (b)    **Adequate Protection Claims.** Effective as of the Petition Date, and subject only to the Carve Out, an allowed administrative expense claim for each of the Prepetition Administrative Agents is hereby granted, for the benefit of their respective Prepetition Secured Parties, in the amount of any Collateral Diminution arising pursuant to section 507(b) of the Bankruptcy Code against the Prepetition Loan Party with priority over all other administrative claims in the Cases (subject only to the Carve Out), including all claims of the kind specified under sections 503(b) of the Bankruptcy Code (the "Administrative Adequate Protection Claims"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Prepetition Loan Party, excluding the Carve Out, and including, without limitation, upon entry of this Final Order, the proceeds or property recovered in respect of any Avoidance Actions. For avoidance of doubt, the Administrative Adequate Protection Claims shall include amounts due (i) to the Prepetition First Lien Secured Parties under Section 12.03 of the First Lien Credit Agreement for all out-of-pocket expenses (including fees and expenses of RPA Advisors, LLC, Bracewell LLP, White & Case LLP and other legal expenses and settlement costs) incurred in connection with these Cases and (ii) to the Prepetition Second Lien Secured Parties under Section 12.03 of the Second Lien NPA for all expenses (including fees and expenses of Kirkland & Ellis LLP, Intrepid Financial Partners, LLC, Rothschild & Co., Shipman & Goodwin LLP, local counsel, if any, to the Second Lien Administrative Agent, Zack A. Clement PLLC, and other legal expenses and settlement costs) incurred in connection with these Cases.  The Administrative Adequate Protection Claims for the benefit of the Prepetition

Second Lien Secured Parties shall be junior and subordinate to the Administrative Adequate Protection Claims for the benefit of the Prepetition First Lien Secured Parties and the Hedge Claims on the same basis as the Prepetition Second Liens are junior and subordinate to the Prepetition First Liens under the Intercreditor Agreement.

        (c)    **Adequate Protection Payments.** The Prepetition Loan Party is authorized and directed to pay to the First Lien Administrative Agent for the ratable benefit of the Prepetition First Lien Secured Parties adequate protection payments on the last Business Day of each calendar month (or when otherwise due and payable) after the entry of the Interim Order, in each case, in an amount equal to all accrued and unpaid (i) prepetition and postpetition interest, and (ii) without duplication of the fees and expenses payable under paragraph 7(e) below, prepetition or postpetition fees and costs due and payable under the First Lien Credit Agreement (including, without limitation, interest on loans, breakage costs and accrued fees owing to the First Lien Administrative Agent).  In the case of adequate protection payments consisting of postpetition interest and other amounts, such payments shall be calculated based on the non-default rate of interest as provided in Section 3.02(a) or (b), as applicable of the First Lien Credit Agreement. The rights of all parties (including the Prepetition First Lien Secured Parties) are reserved as to whether payments made by the Prepetition Loan Party pursuant to this paragraph 7(c) constitute payments of principal, interest or otherwise pursuant to section 506(b) of the Bankruptcy Code. For the avoidance of doubt, interest with respect to the Second Lien NPA shall continue to accrue for the duration of the Cases but shall not be paid as adequate protection absent further order of the Court.

        (d)    **Other Covenants.** The Prepetition Loan Party shall maintain its cash management arrangements in a manner consistent with this Court's interim or final order, as applicable, approving the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing (A) the Maintenance of the Cash Management System; (B) Maintenance of the Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims; and (E) Granting Related Relief*.  Without prejudice to the restrictions contained in Section 9.11 of the DIP Credit Agreement, Prepetition Loan Party shall not use, sell or lease any material assets with an aggregate fair market value in excess of $200,000 in any single transaction or series of related transactions outside the ordinary course of business, or seek authority of this Court to do any of the foregoing, without prior written consent of the First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders) and the Majority DIP Lenders at least five (5) Business Days prior to the date on which the Prepetition Loan Party seeks the authority of this Court for such use, sale or lease; for the avoidance of doubt nothing herein shall limit the Prepetition Loan Party's right to use, sell, or lease assets in the ordinary course of business; provided that, for avoidance of doubt, any "farm-in," "farm-out," or trade or swap of oil and gas properties shall not be permitted except ordinary course transactions with the consent of the Majority DIP Lenders and First Lien Administrative Agent (acting at the direction of the Required Consenting Revolving Credit Agreement Lenders). The Prepetition Loan Party shall comply with the covenants contained in Sections 8.06, 8.07, and 8.11 of the First Lien Credit Agreement regarding the maintenance and insurance of the Prepetition Collateral and the Collateral.

(e) **Fees and Expenses.** Subject to paragraph 34 of this Final Order, as additional adequate protection, the Prepetition Loan Party shall pay in cash on a monthly basis (i) the reasonable professional fees, expenses and disbursements (including, but not limited to, the expenses and disbursements of Bracewell LLP, White & Case, LLP, RPA Advisors, LLC, and other third-party consultants) incurred by the First Lien Administrative Agent and Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement, whether arising prior to or subsequent to the Petition Date; and (ii) the reasonable professional fees, expenses and disbursements (including, but not limited to, the fees, expenses and disbursements of Kirkland & Ellis LLP, Zack A. Clement PLLC, Intrepid Financial Partners, LLC, Rothschild & Co., Shipman & Goodwin LLP and local counsel, if any, to the DIP Administrative Agent and the Second Lien Administrative Agent) incurred by the Second Lien Administrative Agent and Prepetition Second Lien Secured Parties under the Prepetition Second Lien Note Documents, whether arising prior to or subsequent to the Petition Date. The rights of all parties (including the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, and the DIP Secured Parties) are reserved as to whether payments made by the Prepetition Loan Party pursuant to this paragraph 7(e) constitute payments of principal, interest or otherwise pursuant to section 506(b) of the Bankruptcy Code.

(f) **Reporting Requirements.** As additional adequate protection to the Prepetition Secured Parties, the Debtors shall provide the following additional reporting to the First Lien Administrative Agent, Second Lien Administrative Agent, and DIP Administrative Agent (subject to any applicable limitations set forth below, and it being understood that any information shared may be shared with the Prepetition First Lien Lenders, Prepetition Second Lien Holders, and DIP Lenders and that any information delivered to the Prepetition First Lien Lenders shall also be delivered to the Prepetition Second Lien Holders and DIP Lenders and vice versa), with copies of all such reporting shared with counsel to any Committee, if any, and the U.S. Trustee upon request:

(i) [Reserved];

(ii) By 5:00 p.m. Houston time on the last Business Day of each calendar week, commencing with the week following the week the Petition Date occurs, a reporting package that includes (a) current daily production by well (two-stream, gross) provided seven days in arrears, (b) current accounts payable aging report, including capital expenses, (c) current corporate model as available (4 + 8 version or latest equivalent), (d) current hedge mark-to-market detail, (e) final capitalization, including cash balance and debt outstanding for such weekly period, (f) operations report, including current well status and anticipated capital needs, (g) as requested, a six-week cash flow forecast and extended monthly liquidity budget and (h) any other items reasonably requested by the Majority DIP Lenders or the First Lien Administrative Agent, in each case, in form and detail reasonably satisfactory to the Majority DIP Lenders and First Lien Administrative Agent, as applicable;

(iii) The documents relating to the Approved Budget as set forth in paragraph 6 hereof, including the Variance Reports.

(iv)    As soon as available, but in any event in accordance with then applicable law and not later than 60 days after the end of each of the first three fiscal quarters of each fiscal year of RRI, the unaudited consolidating and consolidated balance sheet for RRI and its consolidated subsidiaries and related statements of operations, members' equity, as applicable, and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Responsible Officer (as defined in the DIP Credit Agreement, "Responsible Officer") of RRI as presenting fairly in all material respects the financial condition and results of operations of RRI and its consolidated subsidiaries on a consolidated basis in accordance with GAAP (as defined in the DIP Credit Agreement, "GAAP") consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(v)    Concurrently with any delivery of financial statements under clause (iv), a certificate of a Responsible Officer of each of RRI and the DIP Borrower in substantially the form of Exhibit D of the DIP Credit Agreement (i) certifying as to whether a default has occurred and, if a default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) stating whether any change in GAAP or in the application thereof has occurred since the date of the most recently delivered financial statements referred to in   clause (iv) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(vi)    As soon as reasonably practicable after written request from the First Lien Administrative Agent, Second Lien Administrative Agent, or DIP Administrative Agent, reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by any DIP Loan Party in any of the Cases and, if requested, copies of all retention agreements for each such consultant;

(vii)    Concurrently with any delivery of financial statements under clause (iv), a certificate of a Responsible Officer, in form and substance satisfactory to the Majority DIP Lenders, setting forth as of the last Business Day of the period covered by such financial statements, a true and complete list of all Postpetition Swap Agreements of each DIP Loan Party, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), any new credit support agreements relating thereto (other than Security Instruments (as defined in the DIP Credit Agreement)) not listed on Schedule 7.22 of the DIP Credit Agreement, any margin required or supplied under any credit support document, and the counterparty to each such agreement;

(viii) Within five (5) Business Days following each change in the insurance maintained in accordance with Section 8.07 of the DIP Credit Agreement, certificates of insurance coverage with respect to the insurance required by Section 8.07 of the DIP

Credit Agreement, in form and substance satisfactory to the Majority DIP Lenders, and, if requested by the DIP Administrative Agent or any DIP Lender, all copies of the applicable policies;

(ix)    Prompt written notice, and in any event within ten Business Days, of the occurrence of any Casualty Event (as defined in the DIP Credit Agreement) to any property having a fair market value in excess of $250,000 or the commencement of any condemnation or eminent domain action or proceeding that could reasonably be expected to result in such a Casualty Event;

(x)     Promptly, but in any event no later than three (3) Business Days prior to the execution thereof, copies of any amendment, modification or supplement to any of the organizational documents of the DIP Loan Parties or any subsidiary;

(xi)    Concurrently with the furnishing or receipt thereof, copies of (i) any notice of default or any notice related to the exercise of remedies, in each case  pursuant to the First Lien Credit Agreement, (ii) any amendment or other written modification of the First Lien Credit Agreement and (iii) any other notices, reports, reporting, deliverables or other written information provided under the terms of the First Lien Credit Agreement or the Orders (as defined in the DIP Credit Agreement, "Orders") not otherwise required to be furnished to the DIP Administrative Agent or the DIP Lenders pursuant to any other provisions of the DIP Loan Documents or the Orders;

(xii)   As soon as available, but in any event not later than 45 days after the end of each calendar month, commencing with the first full calendar month after the Closing Date (as defined in the DIP Credit Agreement), a report setting forth, for the trailing twelve month period, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for such trailing twelve month period from the Oil and Gas Properties (as defined in the DIP Credit Agreement, "DIP Oil and Gas Properties"), and setting forth the related ad valorem, severance and production taxes, lease operating expenses and capital expenditures attributable thereto and incurred for such trailing twelve month period;

(xiii) Promptly upon receipt thereof, a copy of each other report or letter submitted to any DIP Loan Party by independent accountants in connection with any annual, interim or special audit made by them of the books of any such person, and a copy of any response by such person, or the board of directors or other appropriate governing body of such person, to such letter or report;

(xiv) Promptly after the same has become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any DIP Loan Party with the SEC or with any national securities exchange;

(xv)   Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than the DIP Credit Agreement and not otherwise required to be furnished to the DIP Lenders pursuant to any other provision of <u>Section 8.01</u> of the DIP Credit Agreement;

(xvi)   In the event the DIP Borrower or any of its Subsidiaries (as defined in the DIP Credit Agreement)  intends to sell, transfer, assign, or otherwise dispose of DIP Oil and Gas Properties (or any Equity Interest (as defined in the DIP Credit Agreement) of any DIP Loan Party that owns DIP Oil and Gas Properties) or terminate, unwind, cancel or otherwise dispose of or monetize Postpetition Swap Agreements, prior written notice of such disposition, termination, unwind or cancellation, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the DIP Administrative Agent or any DIP Lender; <u>provided</u> that the foregoing are subject to the prior written consent of the Majority DIP Lenders in accordance with <u>Section 9.11</u> of the DIP Credit Agreement;

(xvii)   Prompt written notice of (and in any event no later than ten (10) days prior thereto or such other time as the Majority DIP Lenders may agree) any change (i) in a DIP Loan Party's corporate name or in any trade name used to identify such person in the conduct of its business or in the ownership of its properties, (ii) in the location of the DIP Loan Party's chief executive office or principal place of business, (iii) in the DIP Loan Party's identity or corporate structure or in the jurisdiction in which such person is incorporated or formed, (iv) in the DIP Loan Party's jurisdiction of organization or such person's organizational identification number in such jurisdiction of organization, and (v) in the DIP Loan Party's federal taxpayer identification number;

(xviii)   Concurrently with the delivery of any financial statements pursuant to <u>clause (iv)</u> above, a report setting forth, for each fiscal quarter during the then current fiscal year to date, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such fiscal quarter from the DIP Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes, lease operating expenses and capital expenditures attributable thereto and incurred for each such fiscal quarter;

(xix)   [Reserved]

(xx)   Promptly upon request (and in any event within ten (10) Business Days of request), any reporting or information related to environmental, social and governance matters of the DIP Loan Parties as the DIP Administrative Agent or the DIP Lenders may reasonably request from time to time;

(xxi)  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the DIP Borrower or any Subsidiary (as defined in the DIP Credit Agreement) (including any Plan (as defined in the DIP Credit Agreement) or Multiemployer Plan (as defined in the DIP Credit Agreement) and any reports or other information required to be filed under ERISA (as defined in the DIP Credit Agreement)), or compliance with the terms of the DIP Credit Agreement or any other DIP Loan Document, as the DIP Administrative Agent or any DIP Lender may reasonably request; and

(xxii) Promptly after the occurrence of any of the following (and, in any case, no later than three (3) Business Days after knowledge thereof by any DIP Loan Party), the DIP Borrower will furnish written notice of (1) the occurrence of any default or Event of Default (as defined in the DIP Credit Agreement); (2) the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority (as defined in the DIP Credit Agreement) against or affecting the Loan Parties thereof not previously disclosed in writing to the DIP Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration (whether or not previously disclosed to the DIP Lenders) that, in either case, if adversely determined, could reasonably be expected to result in a Material Adverse Effect (as defined in the DIP Credit Agreement); (3) the occurrence of any ERISA Event (as defined in the DIP Credit Agreement) that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect; and (4) the occurrence of any Material Adverse Effect.

8.    **Collateral Diminution.** For purposes of this Final Order, "Collateral Diminution" shall mean an amount equal to the diminution of the value from and after the Petition Date of the Prepetition Administrative Agents' interests in the Prepetition Collateral upon which any of the Prepetition Administrative Agents have valid, perfected, enforceable and non-avoidable liens or security interests, resulting from the use, sale, or lease of the Prepetition Collateral, including Cash Collateral (whether in accordance with the terms and conditions of this Final Order or otherwise), or the imposition of the automatic stay. Cash payments made to the respective Prepetition Secured Parties pursuant to the Interim Order or this Final Order shall reduce each such respective Prepetition Secured Parties' Collateral Diminution on a dollar for dollar basis. For the avoidance of doubt, the rights of all parties in interest, including any

Committee, concerning whether Collateral Diminution has occurred and the extent and/or amount of such Collateral Diminution, are hereby expressly reserved.

9. **Priority of Administrative Adequate Protection Liens and Administrative Adequate Protection Claims.** Except for (i) the Carve Out and (ii) as otherwise provided in paragraph 7 of this Final Order, the Administrative Adequate Protection Liens and Administrative Adequate Protection Claims granted to the Prepetition Secured Parties pursuant to paragraph 7 of this Final Order shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under section 364 of the Bankruptcy Code or otherwise.

10. **Carve Out.**

(a)     As used in this Final Order, "Carve Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (ii) all allowed unpaid fees and disbursements that are both included in the Budget (whether allowed by interim order, final order, procedural order or otherwise) (the "Allowed Professional Fees") and incurred by professionals retained by the Debtors in rendering services to the Debtors and, subject to the limitations set forth in paragraphs 10 and 27 of this Final Order, any Committee to the Debtors (collectively, the "Professional Persons"), and all expenses of members of any such Committee included in the Budget and allowed pursuant to section 503(b)(3)(F) of the Bankruptcy Code incurred at any time before the delivery by the First Lien Administrative Agent or the DIP Administrative Agent of written notice (via electronic mail, overnight delivery or hand delivery) to the Debtors, counsel for the Debtors, counsel to the Second Lien Administrative Agent, the U.S. Trustee, and counsel to any Committee, stating that a Termination Date or Termination Event (as such terms are defined herein) has occurred and is continuing and that the Post-Carve Out Notice Cap has been triggered (a "Carve Out Notice"), in each case, whether allowed by the Court prior to or after delivery of a Carve Out Notice; provided, that Cash Collateral may only be utilized to pay up to the aggregate amounts set forth for Professional Persons in the Budget during such period prior to the delivery of the Carve Out Notice, (iii) the Allowed Professional Fees of the Professional Persons incurred on or after the first Business Day following delivery of the Carve Out Notice in an aggregate amount not to exceed $1,000,000 (the "Post-Carve Out Notice Cap"), and (iv) reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $100,000. Notwithstanding anything to the contrary in this Final Order, in no way shall the Carve Out, Carve Out Reserve or the Budget or any of the foregoing be construed as a cap or

limitation on the amount of Professional Fees due and payable by the Prepetition Loan Party or that may be allowed by the Court at any time.

(b)    Upon delivery of a Carve Out Notice, the Carve Out Notice shall constitute a demand to the Prepetition Loan Party to utilize cash on hand as of the date of such notice and any available cash thereafter held by the Prepetition Loan Party to fund a segregated account held with the First Lien Administrative Agent in trust for the benefit of the Professional Persons (the "Carve Out Reserve") in an amount equal to the sum of (A) all fees and expenses required to be paid pursuant to subparagraphs (i) and (ii) in the definition of Carve Out above (subject to the Budget), (B) all billed and unpaid monthly fees and expenses of all Professional Persons (including outstanding holdbacks) pursuant to subparagraphs (i) and (ii) in the definition of Carve Out above (subject to the Budget); (C) all unbilled fees and expenses of Professional Persons incurred prior to delivery of the Carve Out Notice pursuant to subparagraphs (i) and (ii) in the definition of Carve Out above (subject to the Budget); (D) all billed and unbilled expenses of members of any Committee for the Prepetition Loan Party allowable pursuant to section 503(b)(3)(F) (subject to the Budget); and (E) the Post-Carve Out Notice Cap. The failure of the Carve Out Reserve to satisfy in full the amount set forth in the Carve Out shall not affect the priority of the Carve Out.

(c)    Notwithstanding anything to the contrary in any of the Administrative Credit Documents or this Final Order, following delivery of a Carve Out Notice, the Prepetition Administrative Agents and the Prepetition Secured Parties shall not, and shall not direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Prepetition Loan Party until the Carve Out Reserve has been fully funded. Further, notwithstanding anything to the contrary herein or in the Administrative Credit Documents, in no way shall the Budget, Carve Out, Post-Carve Out Notice Cap, Carve Out Reserve, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Prepetition Loan Party to the Professional Persons; provided that the foregoing shall not be a restriction on any party's rights to object to the allowance of any unpaid fees and disbursements of the Professional Persons.

(d)    Any payment or reimbursement of Allowed Professional Fees made to any Professional Persons prior to the delivery of the Carve Out Notice shall not reduce the Carve Out. Any payment or reimbursement of Allowed Professional Fees made to any Professional Persons on or after the delivery of the Carve Out Notice shall permanently reduce the Carve Out on a dollar-for-dollar basis. For the avoidance of doubt, the funding or payment of the Carve Out from cash on hand or other available cash shall not reduce Prepetition First Lien Secured Indebtedness or the amounts outstanding under the Prepetition Second Lien Note Documents (collectively, the "Prepetition Secured Indebtedness").

(e)    Notwithstanding anything in this Final Order to the contrary, no portion of the Carve Out or any other Prepetition Collateral or Collateral, shall be used for professional fees and expenses incurred for any litigation or threatened litigation against any of the Prepetition Secured Parties or for the purpose of challenging the validity, extent or priority of any claim, lien or security interest held or asserted by the Prepetition Secured Parties or asserting any defense, claim, counterclaim, or offset with respect to the Prepetition Secured Indebtedness or the security

interests or liens held by the Prepetition Secured Parties in the Prepetition Collateral or Collateral; provided, however, that (i) an aggregate of $50,000 from the Carve Out may be used to pay Allowed Professional Fees and expenses of any Committee to investigate the claims and liens of the Prepetition Secured Parties and (ii) the Prepetition Loan Party may use Cash Collateral to pay Allowed Professional Fees incurred by the Prepetition Loan Party in order to respond to discovery requests by any Committee in connection with such investigation, subject to the Budget.

11.    **Postpetition Lien Perfection.** Without the necessity of the filing of financing statements, security agreements, federal or state notices, pledge agreements, recordings, mortgages or other documents or taking possession or control of any Collateral, this Final Order shall be sufficient evidence of the Administrative Agents' perfected security interests and liens granted in the Collateral pursuant to this Final Order. Notwithstanding the foregoing, the DIP Loan Parties are authorized and directed to execute such documents including, without limitation, mortgages, pledges and Uniform Commercial Code financing statements and to use Cash Collateral to pay such costs and expenses as may be reasonably requested by the First Lien Administrative Agent, the Second Lien Administrative Agent or the DIP Administrative Agent to provide further evidence of the perfection of the First Lien Administrative Agent's, the Second Lien Administrative Agent's, or the DIP Administrative Agent's security interests and liens in the Collateral or the DIP Collateral as provided for herein.  All such documents shall be deemed to have been recorded and filed as of the Petition Date.

12.    **Inspection Rights.** In addition to, and without limiting, whatever rights to access the Prepetition First Lien Secured Parties have under the Prepetition First Lien Credit Documents or the Prepetition Second Lien Secured Parties have under the Prepetition Second Lien Note Documents, upon reasonable prior written notice (including via acknowledged electronic mail) during normal business hours, the Debtors shall permit representatives, agents and employees of the First Lien Administrative Agent, the Prepetition Second Lien Holders, and/or the Majority DIP Lenders to (i) have reasonable access to and inspect and copy the

Debtors' books and records, including all records and files of the Debtors pertaining to the Prepetition Collateral, the Collateral and the DIP Collateral, (ii) have reasonable access to and inspect the Debtors' properties and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

13.    **Cash Collateral Termination Events.** Subject to paragraphs 10 and 15 of this Final Order, the DIP Loan Parties' right to use the Cash Collateral pursuant to this Final Order shall automatically terminate (the date of any such termination, the "Cash Collateral Termination Date") without further court proceedings on the earliest to occur of any of the events set forth in   clauses (a) through (p) below (such events, collectively, the "Cash Collateral Termination Events"):

(a)    [Reserved];

(b)    entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending this Final Order without the express written consent of the First Lien Administrative Agent, acting at the direction of the First Lien Majority Lenders;

(c)    any Debtor's case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or, without the express written consent of the First Lien Administrative Agent acting at the direction of the First Lien Majority Lenders, a trustee under chapter 11 of the Bankruptcy Code or an examiner with expanded powers is appointed in any Debtor's case, or any Debtor seeks entry of an order accomplishing any of the foregoing;

(d)    except as otherwise provided in this Final Order, (i) an order is entered granting another claim or lien pari passu with or senior to the Prepetition First Liens, Administrative Adequate Protection Liens, Hedge Liens, or Administrative Adequate Protection Claims or Hedge Claims, under this Final Order or an order of the Court is entered reversing, staying for a period in excess of ten (10) Business Days, vacating or otherwise amending, supplementing, or modifying this Final Order in a manner materially adverse to the Prepetition First Lien Secured Parties or Hedge Providers, in each case without the written consent of the First Lien Administrative Agent acting at the direction of the First Lien Majority Lenders or (ii) an order is entered granting another claim or lien pari passu with or senior to the Prepetition Second Liens, Administrative Adequate Protection Liens or Administrative Adequate Protection Claims, under this Final Order or an order of the Court is entered reversing, staying for a period in excess of ten (10) Business Days, vacating or otherwise amending, supplementing or modifying this Final Order in a manner materially adverse to the Prepetition Second Lien Secured

Parties, in each case without the written consent of the Second Lien Administrative Agent acting at the direction of the Requisite Holders (as defined in the Second Lien NPA);

(e)     any proceeding is commenced by any Debtor seeking, or otherwise consenting to, (x) the invalidation, subordination, or other challenge to the Prepetition First Lien Secured Indebtedness, Prepetition First Liens, Prepetition Second Lien Secured Indebtedness, Prepetition Second Liens, Administrative Adequate Protection Liens, or Administrative Adequate Protection Claims, or Hedge Claims or Hedge Liens or (y) any relief under section 506(c) of the Bankruptcy Code with respect to any Prepetition Collateral or any Collateral, including the Cash Collateral, or (ii) any Debtor files a motion, pleading, or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Prepetition Secured Parties or Hedge Providers, except any motion or other pleading otherwise permitted by this Final Order;

(f)     the entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Administrative Agents or the Prepetition Secured Parties with respect to the Prepetition Collateral or the Collateral without the written consent of the First Lien Administrative Agent acting at the direction of the First Lien Majority Lenders and the Second Lien Administrative Agent acting at the direction of the Requisite Lenders (as defined in the Second Lien NPA), which consent may be withheld in its sole discretion;

(g)     the effective date of any confirmed chapter 11 plan for any of the Debtors;

(h)     the entry of a subsequent order of the Court (i) terminating the Prepetition Loan Party's use of Cash Collateral or (ii) authorizing the use of Cash Collateral by any person that is not the Prepetition Loan Party;

(i)     the failure by the Prepetition Loan Party to make any payment required pursuant to this Final Order when due;

(j)     the failure by the Debtors to deliver to the First Lien Administrative Agent any of the documents or other information required to be delivered pursuant to this Final Order when due or any such documents or other information shall contain a material misrepresentation;

(k)     failure to adhere to the Approved Budget during any Testing Period except as allowed pursuant to paragraph 6 of this Final Order;

(l)     failure of the Debtors to timely make any payment due under any hedge agreement or any other "event of default" or "termination event" occurs under any hedge agreement (except any "event of default" or "termination event" that is modified or stayed pursuant to the Hedge Order);

(m)     the Consenting Revolving Credit Agreement Lenders (as defined in the Restructuring Support Agreement) shall have terminated the Restructuring Support Agreement in accordance with the terms thereof;

(n)     the failure of the Debtors to observe or perform any of the material terms or material provisions contained herein;

(o)     the entry of an order of this Court approving the terms of any debtor in possession financing for any Debtor other than the DIP Facility; or

(p)     the Debtors shall fail to meet any of the Milestones (as defined in the Restructuring Support Agreement), as the same may be extended pursuant to the Restructuring Support Agreement.

14.     **DIP Termination Events.**  Subject to paragraphs 10 and 15 of this Final Order, the occurrence and continuance of any "Event of Default" (as defined in the DIP Credit Agreement) under the DIP Credit Agreement shall constitute a "DIP Termination Event" under this Final Order (the date upon which such DIP Termination Event occurs, the "DIP Termination Date") unless waived in writing by the Majority DIP Lenders.  On the DIP Termination Date, (a) the maturity of the DIP Facility shall be accelerated to the DIP Termination Date (provided that the DIP Liens shall remain subject to the lien subordination provisions set forth herein (including paragraph 16) and payments of DIP Obligations, other than DIP Obligations incurred pursuant to the Agent Fee Letter, shall remain subject to the payment subordination provisions set forth herein) and (b) the DIP Loan Parties' right to use the Cash Collateral pursuant to this Final Order shall automatically terminate.

15.     **Remedies After a Termination Date.**  The First Lien Administrative Agent shall deliver notice of the occurrence of any Cash Collateral Termination Event, and the DIP Administrative Agent shall deliver notice of a DIP Termination Event (together with any Cash Collateral Termination Event, a "Termination Event"), in each case, to counsel for the Debtors, the First Lien Administrative Agent, the Second Lien Administrative Agent, the DIP

Administrative Agent, the U.S. Trustee, and any Committee, file a motion with the Court, and request an emergency hearing on the same (the "Emergency Default Hearing"). The Court shall conduct the Emergency Default Hearing upon no more than five (5) Business Days' notice (subject to reasonable extension based on the Court's availability). At the Emergency Default Hearing, the Court will only hear and determine (i) whether a Termination Event has occurred (if such Termination Event is determined by this Court to have occurred, the "Adjudicated Default") and (ii) the quantum of any Collateral Diminution (if any). Nothing herein shall alter the rights or burden of proof with respect to any request by the Debtors or other party in interest to re-impose or continue the automatic stay under section 362(a) of the Bankruptcy Code, use Cash Collateral, or to obtain any other injunctive relief. The Debtors hereby waive any right to seek relief, including without limitation under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the First Lien Administrative Agent, the Prepetition First Lien Secured Parties, the Second Lien Administrative Agent, the Prepetition Second Lien Secured Parties, the DIP Administrative Agent, or the DIP Secured Parties set forth in this Final Order. Subject to paragraphs 5(f) and 5(g) above and paragraph 16 below and the Intercreditor Agreement, upon the occurrence of the Adjudicated Default, and absent authority to use Cash Collateral without the consent of the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties and the DIP Secured Parties, the automatic stay shall be deemed automatically lifted with respect to the Prepetition Collateral, the Collateral, the Cash Collateral, and the DIP Collateral and the First Lien Administrative Agent, the Second Lien Administrative Agent, and the DIP Administrative Agent shall have the right to exercise any other remedies customary for secured lenders, as applicable, including set-off and foreclosure, in connection with the Hedge Claims, Prepetition First Lien Credit Documents, the Prepetition

Second Lien Note Documents, and the DIP Loan Documents, respectively (subject to paragraphs 5(f) and 5(g) above and paragraph 16 below). For the avoidance of doubt, the automatic stay shall not be lifted absent the filing and granting of a motion explicitly seeking such relief. In addition, after the First Lien Administrative Agent, the Second Lien Administrative Agent or the DIP Administrative Agent delivers notice of a Termination Event, but prior to the Emergency Default Hearing, except as may be otherwise ordered by the Court, the DIP Loan Parties shall not use any Cash Collateral to pay any expenses except those which are (a) necessary to preserve the DIP Loan Parties' going concern value or (b) necessary to contest in good faith whether a Termination Event has occurred. Notwithstanding anything in this paragraph to the contrary, after notice and hearing, the Court may order such relief as it determines is appropriate following a Termination Event. Subject to paragraph 16, any delay or failure of the Administrative Agents or the Secured Parties to exercise rights under the Prepetition First Lien Credit Documents, the Prepetition Second Lien Note Documents, the DIP Loan Documents or this Final Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise. Notwithstanding anything to the contrary in this Final Order, the entry of this Final Order and the grant of adequate protection to the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties pursuant to the terms hereof shall be without prejudice to the rights of the Debtors to, following the occurrence of the Termination Date, seek authority (at any time) to use Cash Collateral and the Prepetition Collateral without the consent of the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, or the DIP Secured Parties, as applicable, and the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, and the DIP Secured Parties reserve all of their respective rights with respect to contesting any such

motion or request by the Debtors or any other person; provided that the Debtors may not utilize Cash Collateral to seek such authority.

        16.    **DIP Standstill**.  Prior to the expiration of the DIP Standstill Period (as defined below), neither the DIP Administrative Agent nor any DIP Secured Party shall enforce or exercise any rights or remedies with respect to the DIP Collateral.  Upon the occurrence of an Adjudicated Default, after a period of 180 days has elapsed (which period will be tolled during any period in which (a) the First Lien Administrative Agent is diligently pursuing the enforcement or exercise of any rights or remedies with respect to a material portion of or substantially all of the Prepetition Collateral or the Collateral, (b) the First Lien Administrative Agent is not entitled, on behalf of the Prepetition First Lien Secured Parties, or is restricted in its ability, to enforce or exercise any rights or remedies with respect to a material portion of or substantially all of the Prepetition Collateral or the Collateral as a result of (i) any injunction issued by a court of competent jurisdiction or (ii) the automatic stay or any other stay or other prohibition in the Cases, (c) the Second Lien Administrative Agent is diligently pursuing the enforcement or exercise of any rights or remedies with respect to a material portion of or substantially all of the Prepetition Collateral or the Collateral, or (d) the Second Lien Administrative Agent is not entitled, on behalf of the Prepetition Second Lien Secured Parties, or is restricted in its ability, to enforce or exercise any rights or remedies with respect to a material portion of or substantially all of the Prepetition Collateral or the Collateral as a result of (i) any injunction issued by a court of competent jurisdiction or (ii) the automatic stay or any other stay or other prohibition in the Cases  since the date that the Court determines an Adjudicated Default has occurred (the "DIP Standstill Period")), the DIP Administrative Agent and the other DIP Secured Parties may (at the direction of the Majority DIP Lenders) enforce or exercise any rights or remedies with respect to any DIP

Collateral; provided, however that notwithstanding the expiration of the DIP Standstill Period or anything in the DIP Loan Documents to the contrary, in no event may the DIP Administrative Agent or any other DIP Secured Party enforce or exercise any rights or remedies with respect to any DIP Collateral, or commence, join with any person at any time in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding, if the First Lien Administrative Agent, on behalf of any or all of the Prepetition First Lien Secured Parties, or any other Prepetition First Lien Secured Party or the Second Lien Administrative Agent, on behalf of any or all of the Prepetition Second Lien Secured Parties, or any other Prepetition Second Lien Secured Parties, shall have commenced, and shall be diligently pursuing (or shall have sought or requested relief from, or modification of, the automatic stay or any other stay or other prohibition in the Cases to enable the commencement and pursuit thereof), the enforcement or exercise of any rights or remedies with respect to any material portion of the Prepetition Collateral or the Collateral or any such action or proceeding (prompt written notice thereof to be given to DIP Administrative Agent by the First Lien Administrative Agent or the Second Lien Administrative Agent, as applicable); provided, further, that, at any time after the expiration of the DIP Standstill Period, if none of the First Lien Administrative Agent, the Second Lien Administrative Agent, the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties shall have commenced and be diligently pursuing (or shall have sought or requested relief from, or modification of, the automatic stay or any other stay or other prohibition in the Cases to enable the commencement and pursuit thereof) the enforcement or exercise of any rights or remedies with respect to all or any material portion of the Prepetition Collateral or the Collateral or any such action or proceeding, and the DIP Administrative Agent shall have commenced the enforcement or exercise of any rights or remedies with respect to all or any material portion of

the DIP Collateral or any such action or proceeding, then for so long as the DIP Administrative Agent is diligently pursuing such rights or remedies, none of the First Lien Administrative Agent, the Second Lien Administrative Agent, the Prepetition First Lien Secured Parties, or the Prepetition Second Lien Secured Parties shall take any action of a similar nature with respect to such DIP Collateral, or commence, join with any person at any time in commencing, or petition for or vote in favor of any resolution for, any such action or proceeding; provided that the foregoing shall not restrain the First Lien Administrative Agent's, the Second Lien Administrative Agent's, any Prepetition First Lien Secured Party's, or any Prepetition Second Lien Secured Party's participation in any sale or plan process (including by credit bid), or actions taken to create, preserve or protect their respective liens in the Prepetition Collateral and the Collateral, including filing proofs of claim or defensive or responsive pleadings to the extent such participation and actions are otherwise allowed by this Final Order, the Final Order, the Court or the Cases.  Notwithstanding anything in this paragraph 16 to the contrary, Article III of the Intercreditor Agreement shall remain in full force and effect.

17.     **Payments Free and Clear.** Any and all payments or proceeds remitted to the Hedge Providers, the Prepetition Administrative Agents on behalf of the Prepetition Secured Parties or to the DIP Administrative Agent on behalf of the DIP Secured Parties pursuant to the provisions of this Final Order or any subsequent order of this Court shall be irrevocable (subject to paragraph 27 of this Final Order), received free and clear of any claim, charge, assessment or other liability, including without limitation, upon entry of this Final Order, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) (whether asserted or assessed by, through or on behalf of any Debtor) or 552(b).

18.     **Application of Collateral Proceeds**. Subject to entry of an order of this Court to the contrary, following the occurrence of a Termination Event, the Debtors are hereby authorized to fund the Carve Out Reserve from 100% of all collections on, and proceeds of, the DIP Collateral, Prepetition Collateral and the Collateral, including, without limitation, all accounts receivable collections, proceeds of sales of hydrocarbons, inventory, fixed assets, and any other assets, including sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Petition Date come into the possession or control of the Debtors, or to which the Debtors shall become entitled at any time. Unless otherwise ordered by the Court, the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the Prepetition Secured Parties to retain and apply all collections, remittances, and proceeds of the Prepetition Collateral and the Collateral subject to and in accordance with this Final Order and the Administrative Credit Documents to the Prepetition Secured Indebtedness in accordance with the provisions of this Final Order and the Administrative Credit Documents (subject to the Carve Out, as described above).

19.     **Hedge Proceeds**.  Any proceeds owed to a Prepetition First Lien Secured Party under a prepetition interest rate swap are Cash Collateral of the Prepetition First Lien Secured Parties.  Any proceeds owed by a Prepetition First Lien Secured Party under a prepetition interest rate swap may, at the discretion of the Prepetition First Lien Secured Parties, be setoff and applied against the Prepetition First Lien Secured Indebtedness.  This Final Order is without prejudice to the rights of the Prepetition First Lien Secured Parties under the Bankruptcy Code safe harbor provisions found in 11 U.S.C. §§ 362, 546, 555, 556, 559, 560, 561, or otherwise.  To the extent there is any conflict between this Final Order and Hedge Order (including, without limitation, respective lien and payment priority of prepetition interest rates swaps or Hedge

Claims or the rights and remedies of the applicable Prepetition First Lien Secured Party or Hedge Provider), the terms of the Hedge Order shall control.

20. **Limitation on Charging Expenses Against Collateral**. Upon entry of this Final Order, all rights to surcharge the interests of the Prepetition Secured Parties in any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in the Cases.

21. **Reservation of Rights of the Prepetition Secured Parties**. This Final Order and the transactions contemplated hereby shall be without prejudice to (i) the rights of the Prepetition Secured Parties (which remain subject to the Intercreditor Agreement) to seek additional or different adequate protection, move to vacate the automatic stay, move for the appointment of a trustee or examiner, move to dismiss or convert the Cases, or to take any other action in the Cases and to appear and be heard in any matter raised in the Cases, or any party in interest from contesting any of the foregoing, and (ii) any and all rights, remedies, claims and causes of action which the Prepetition Administrative Agents, and the Prepetition Secured Parties may have against any non-Debtor party liable for the Prepetition Secured Indebtedness. For all adequate protection purposes throughout the Cases, the Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection for any Collateral Diminution from and after the Petition Date. For the avoidance of doubt, such request will survive termination of this Final Order.

22. **Modification of Automatic Stay**. The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Final Order and the transactions

contemplated hereby, including (a) the granting of the DIP Liens and the DIP Claims, and to perform such acts as the DIP Secured Parties may reasonable request to assure the perfection and priority of the DIP Liens and the DIP Claims, and (b) the DIP Loan Parties incurring all liability and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under this Final Order and the DIP Loan Documents, and to enter into and perform under the DIP Loan Documents and any and all other instruments, certificates, agreements, and documents that may be reasonably required, necessary, or prudent for the performance by the applicable DIP Loan Parties under the DIP Loan Documents and any transactions contemplated therein or in this Final Order, in each case in accordance herewith or therewith.  The stay of section 362 of the Bankruptcy Code is hereby modified to permit the parties to accomplish the transactions contemplated by this Final Order.

23. **Survival of Interim Order**. The provisions of this Final Order shall be binding upon any trustee appointed during the Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code or any Successor Cases, and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Cases to chapter 7 cases or any other Successor Cases, dismissing the Cases under section 1112 of the Bankruptcy Code or otherwise, or confirming or consummating any plan(s) of reorganization. The terms and provisions of this Final Order, as well as the priorities in payments, liens, and security interests granted pursuant to this Final Order shall continue notwithstanding any conversion of the Cases to chapter 7 cases or any other Successor Cases under the Bankruptcy Code, dismissal of the Cases or confirmation or consummation of any plan(s) of reorganization. Subject to the limitations described in paragraph 27 of this Final Order, the adequate protection payments made pursuant to this Final Order shall not be subject to counterclaim, setoff, subordination,

recharacterization, defense or avoidance in the Cases or any Successor Cases (other than a defense that the payment has actually been made); provided, recharacterization will be allowed to the extent otherwise provided in this Final Order.

24.     **No Liability to Third Parties**. With respect to the use of Cash Collateral, the entry into the DIP Facility or the providing of the DIP Loans, or any approval or disapproval of expenditures set forth in the Budget including, without limitation, any Permitted Variances, the Administrative Agents and the other Secured Parties shall not: (i) be deemed to be in "control" of the operations of the Debtors; (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).

25.     **Binding Effect**. The terms of this Final Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties in interest from and after the entry of this Final Order by this Court.

26.     **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order.** The Hedge Providers, the DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the DIP Financing, and this Final Order, and their reliance on this Final Order is in good faith. Based on the findings set forth in this Final Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the Hedge Providers, DIP Secured Parties and the Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Final Order and the DIP Loan

Documents. If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect the validity, priority, or enforceability of the Hedge Claims, Hedge Liens, DIP Obligations, the DIP Liens, the Administrative Adequate Protection Liens, the Administrative Adequate Protection Claims, the Prepetition Liens, or the Prepetition Secured Obligations. Notwithstanding any such reversal, modification, vacatur, or stay of this Final Order, any Hedge Claim, Hedge Lien, DIP Obligations, DIP Liens, or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Secured Parties or the Prepetition Secured Parties or Hedge Providers, as the case may be, prior to the actual receipt of written notice by the DIP Administrative Agent and the Prepetition Agents of the effective date of such reversal, modification, vacatur stay shall be governed in all respects by the original provisions of this Final Order.

27.     **Reservation of Certain Third Party Rights and Bar of Challenge and Claims**. The Debtors' admissions and releases contained in paragraphs D, E, F, G, and H of this Final Order (i) shall be binding upon the Debtors for all purposes and (ii) shall be binding upon all other parties in interest, including any Committee, for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such party's right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than the date that is the latest of (A) the earlier of forty-five (45) days from the Petition Date or the deadline to object to confirmation of the Plan for all parties other than any Committee, (B) sixty (60) days from the date of formation of any Committee, (C) such later date as has been agreed to, in writing, by the Secured Parties, or (D) any such later date as has been ordered by the Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a Challenge (the "Challenge Deadline") (x) challenging the amount, validity, perfection,

enforceability, priority or extent of the Prepetition First Lien Secured Indebtedness, the Prepetition First Liens, the Prepetition Second Lien Indebtedness, or the Prepetition Second Liens or (y) otherwise asserting or prosecuting any action for preference, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests and defenses against the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties on behalf of the Debtors' estates (collectively, "Challenges"). If no such Challenge is properly filed as of such dates or the plaintiff's claims are dismissed or denied by final and unappealable order in any such proceeding or matter, then: (a) the Debtors' admissions and releases contained in paragraphs D, E, F, G, and H of this Final Order shall be binding on all parties in interest, including any Committee; (b) the obligations of the Debtors under the Prepetition First Lien Documents and the Prepetition Second Lien Documents shall constitute allowed claims for all purposes in the Cases, and any Successor Cases; (c) the Prepetition First Lien Secured Parties' and the Prepetition Second Lien Secured Parties' security interests in and liens upon the Prepetition Collateral and the Collateral shall be deemed to have been, as of the Petition Date a legal, valid, binding, perfected, first priority security interests and liens, subject only to Permitted Prior Liens, and not subject to recharacterization, subordination or otherwise avoidable; and (d) the Prepetition First Lien Secured Indebtedness, the Prepetition First Liens, the Prepetition Second Lien Secured Indebtedness, and the Prepetition Second Liens on the Prepetition Collateral and the Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto. If any such adversary proceeding or contested matter is properly filed as of such dates, the Debtors' admissions and releases contained in paragraphs  D, E, F, G, and H of this Final Order shall nonetheless remain

binding and preclusive (as provided in the second sentence of this paragraph) except to the extent that such admissions and releases were expressly challenged in such adversary proceeding or contested matter. Nothing contained in this Final Order shall be deemed to grant standing to any Committee or any other party to commence any such adversary proceeding or contested matter.

28.     **Intercreditor Agreement**.  Except as expressly provided herein, nothing within this Final Order shall alter or affect the rights and obligations of the Prepetition Secured Parties pursuant to the Intercreditor Agreement.  For the avoidance of doubt, in the event any provision of this Final Order conflicts with the terms of the Intercreditor Agreement with respect to the rights and obligations of the Prepetition Secured Parties among each other, this Final Order shall control.

29.     **Enforceability; Waiver of Any Applicable Stay**. This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

30.     **No Impact on Certain Contracts or Transactions**. No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 and 561 of the Bankruptcy Code are affected by the provisions of this Final Order.

31.     **Proofs of Claim**. None of the Hedge Providers, Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, nor the DIP Secured Parties will be required to file proofs of claim in any of the Cases or successor cases, and the Debtors'

stipulations in paragraph D and E herein and this Final Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtors. Notwithstanding the foregoing, each of the Hedge Providers, the First Lien Administrative Agent, the Second Lien Administrative Agent, and the DIP Administrative Agent (on behalf of itself and its respective Secured Parties, as applicable) is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim for any claims of the Hedge Claims, Prepetition First Lien Secured Parties, Prepetition Second Lien Secured Parties, or DIP Secured Parties, as applicable, arising from the applicable documents evidencing the Hedge Claims, Administrative Credit Documents or DIP Loan Documents; *provided*, that nothing herein shall waive the right of any Hedge Provider, Prepetition Secured Party or DIP Secured Party to file its own proofs of claim against the Debtors.

32.     **Section 552(b) of the Bankruptcy Code**. Upon entry of this Final Order, the Hedge Providers, the Administrative Agents and the Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Hedge Providers, Administrative Agents and the Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral, the Collateral or the DIP Collateral.

33.     **No Marshaling**. Upon entry of this Final Order, neither of the Administrative Agents nor the Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, the Collateral or the DIP Collateral except as expressly provided herein, as applicable.

34.     **Notice Procedures for Professional Fees**. Professionals for the Prepetition First Lien Secured Parties, the Prepetition Second Lien Secured Parties, and the DIP Secured

Parties (collectively, the "Lender Professionals") shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to this Court. Requests for payment of any Lender Professionals' fees, costs, expenses, or disbursements permitted under paragraphs 2(d)(iii) or 7(e) of this Final Order shall be submitted to (i) Gibson, Dunn & Crutcher LLP, (ii) the U.S. Trustee, and (iii) any statutory committee appointed in these Cases, and shall include invoices describing in customary detail the applicable fees, costs, expenses, or disbursements (subject in all respects to applicable privilege or work product doctrines and redacted for privileged, confidential, or otherwise sensitive information) (collectively, the "Invoiced Fees"). The Debtors, the U.S. Trustee, and any statutory committee appointed in these Cases (each a "Fee Review Party") shall have ten (10) calendar days commencing upon the date of receipt of the applicable Invoiced Fees to notify a party submitting such Invoiced Fees (a "Submitting Party") in writing of any specific objections to such Invoiced Fees (a "Fee Objection"). If the Submitting Party and the Fee Review Party that submitted a Fee Objection are unable to mutually resolve the Fee Objection, then either party may file with the Court a motion or other pleading seeking a determination regarding such Fee Objection, with at least ten (10) calendar days' notice of any hearing on such motion or other pleading. The Debtors shall timely pay in accordance with the terms and conditions of this Final Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely made in accordance with paragraphs 2(d)(iii) or 7(e) (or which is subsequently allowed by agreement or an order of the Court), and (b) all fees, costs, and expenses on an invoice to which no Fee Objection has been timely made by a Fee Review Party.

35. **Headings**. The headings in this Final Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Final Order.

36.   **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce this Final Order.

37.   **Final Order Governs**.  All actions taken in connection with or in reliance on the Interim Order are reaffirmed in full as part of entry of this Final Order, and in the event of a conflict between the provisions of the Interim Order and this Final Order, the terms of this Final Order shall control and govern to the extent of such conflict.

 Signed:  August 28, 2020.

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**